## TIGNER *v.* TEXAS.

No. 635. Argued March 29, 1940.—Decided May 6, 1940.

*Mr. Charles I. Francis,* with whom *Mr. William A. Vinson* was on the brief, for appellant.

*Messrs. George W. Barcus,* Assistant Attorney General of Texas, and *Lloyd Davidson,* with whom *Messrs. Gerald C. Mann,* Attorney General, *Dan W. Jackson,* and *C. K. Bullard* were on the brief, for appellee.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an appeal under § 237 (a) of the Judicial Code, as amended, 28 U. S. C. § 344, to review a judgment of the Court of Criminal Appeals of Texas sustaining the

constitutionality of a Texas anti-trust law, and therefore upholding an indictment under it. Appellant was charged with participation in a conspiracy to fix the retail price of beer. Such a conspiracy is made a criminal offense by Title 19, Chapter 3, of the Texas Penal Code. Because the provisions of this law do not "apply to agricultural products or live stock in the hands of the producer or raiser," Art. 1642, Tigner challenged the validity of the entire statute and sought release in the local courts by *habeas corpus*. His claim has been rejected by the Texas Court of Criminal Appeals. 132 S. W. 2d 885. Essentially his contention is that the exemption granted by the Texas statute falls within the condemnation of *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, as offensive to "the equal protection of the laws" which the Fourteenth Amendment safeguards. If that case controls, appellant contends, the Texas Act cannot survive and he must go free.

The court below recognized that the exemption was identical with that deemed fatal to the Illinois statute involved in *Connolly's* case. But it felt that time and circumstances had drained that case of vitality, leaving it free to treat the exemption as an exercise of legislative discretion. A similar attitude has been reflected by the Supreme Court of Wisconsin, *Northern Wisconsin Cooperative Tobacco Pool* v. *Bekkedal*, 182 Wis. 571, 593; 197 N. W. 936, and appears to underlie much recent state and federal legislation. Dealing as we are with an appeal to the Constitution, the *Connolly* case ought not to foreclose us from considering this exemption in its own setting.

The problem, in brief, is this: May Texas promote its policy of freedom for economic enterprise by utilizing the criminal law against various forms of combination and monopoly, but exclude from criminal punishment corresponding activities of agriculture?

Legislation, both state and federal, similar to that of Texas had its origin in fear of the concentration of industrial power following the Civil War. Law was invoked to buttress the traditional system of free competition, free markets and free enterprise. Pressure for this legislation came more particularly from those who as producers, as well as consumers, constituted the most dispersed economic groups.[1] These large sections of the population—those who labored with their hands and those who worked the soil—were as a matter of economic fact in a different relation to the community from that occupied by industrial combinations. Farmers were widely scattered and inured to habits of individualism; their economic fate was in large measure dependent upon contingencies beyond their control. In these circumstances, legislators may well have thought combinations of farmers and stockmen presented no threat to the community, or, at least, the threat was of a different order from that arising through combinations of industrialists and middlemen. At all events legislation like that of Texas rested on this view, curbing industrial and commercial combinations, and did not visit the same condemnation upon collaborative efforts by farmers and stockmen because the latter were felt to have a different economic significance.[2]

Since *Connolly's* case was decided, nearly forty years ago, an impressive legislative movement bears witness to

---

[1] See 2 Beard, The Rise of American Civilization, pp. 254–343; Buck, The Granger Movement, *passim;* Hicks, The Populist Revolt, *passim;* Sheldon, Populism in the Old Dominion, pp. 17–20. Compare the letter of Mr. Justice Miller in Fairman, Mr. Justice Miller and the Supreme Court, p. 67. For the background of the Texas legislation see Finty, Anti-Trust Legislation in Texas, a collection of articles published in the Galveston News during the summer of 1916; Nutting, The Texas Anti-Trust Law: A Post-Mortem 14 Tex. L. Rev. 293.

[2] See Seager and Gulick, Trust and Corporation Problems, pp. 149–95, 339–85.

general acceptance of the view that the differences between agriculture and industry call for differentiation in the formulation of public policy. The states as well as the United States have sanctioned coöperative action by farmers; have restricted their amenability to the anti-trust laws; have relieved their organizations from taxation. See, e. g., Capper-Volstead Act, 42 Stat. 388, 7 U. S. C. § 291; Clayton Act, 38 Stat. 730, 731, 15 U. S. C. § 17; § 101 (1) of the Internal Revenue Code, 53 Stat. 33. Such expressions of legislative policy have withstood challenge in the courts. *Liberty Warehouse Co.* v. *Tobacco Growers,* 276 U. S. 71.[3] Congress and the states have sometimes thought it necessary to control the supply and price of agricultural commodities within their respective spheres of jurisdiction, and the constitutional validity of these measures has been sustained. *Mulford* v. *Smith,* 307 U. S. 38; *United States* v. *Rock Royal Co-op.,* 307 U. S. 533; *Nebbia* v. *New York,* 291 U. S. 502.

At the core of all these enactments lies a conception of price and production policy for agriculture very different from that which underlies the demands made upon industry and commerce by anti-trust laws.[4] These vari-

---

[3] The state court cases are collected in *United States* v. *Rock Royal Co-op.,* 307 U. S. 533, 563–64. See Hanna, Law of Cooperative Marketing Associations, pp. 26–111. Compare *German Alliance Ins. Co.* v. *Lewis,* 233 U. S. 389, 418; *International Harvester Co.* v. *Missouri,* 234 U. S. 199; *Aero Transit Co.* v. *Georgia Comm'n,* 295 U. S. 285.

[4] See, for instance, the findings and declarations of policy embodied in the Agricultural Adjustment Act of 1938, 52 Stat. 31, 120, 202, 215, 586, 775. Compare Seager and Gulick, *op. cit. supra,* note 2, pp. 322–23; Black, Agricultural Reform in the United States, pp. 1–61, 337–49; Nourse, Davis and Black, Three Years of the Agricultural Adjustment Administration, *passim;* Nourse, Marketing Agreements Under the A.A.A., pp. 315–49. Compare, as to railroad and express consolidations, § 5 (8) of the Interstate Commerce Act as amended, 41 Stat. 456, 482, 49 U. S. C. § 5 (8); as to bituminous coal, see § 4, I (d) of the Bituminous Coal Act of 1937, 50 Stat. 72, 77.

ous measures are manifestations of the fact that in our national economy agriculture expresses functions and forces different from the other elements in the total economic process. Certainly these are differences which may be acted upon by the lawmakers. The equality at which the "equal protection" clause aims is not a disembodied equality. The Fourteenth Amendment enjoins "the equal protection of the laws," and laws are not abstract propositions. They do not relate to abstract units A, B and C, but are expressions of policy arising out of specific difficulties, addressed to the attainment of specific ends by the use of specific remedies. The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same. And so we conclude that to write into law the differences between agriculture and other economic pursuits was within the power of the Texas legislature. *Connolly's* case has been worn away by the erosion of time, and we are of opinion that it is no longer controlling.

Another feature of Texas anti-trust legislation is relied on by Tigner to invalidate the criminal statute under which he is being prosecuted. Beginning with the first enactment in 1894, the Texas anti-trust laws have had a complicated and checkered history. At present there are two statutes directed at combination and monopoly—the one under which Tigner was indicted, and another, subjecting to civil penalties the same conduct at which the challenged criminal law is aimed. Title 126, Revised Civil Statutes. From such civil proceedings, which the Attorney General initiates, no exemption is given to farmers and stockmen. Appellant urges that the divergence between civil and criminal laws relating to the same conduct undermines the validity of the exemption in the criminal statute and thus invalidates the whole of it. This argument is but a minor variation on appellant's main theme. It amounts to a claim that differences

substantial enough to permit substantive differentiation in formulating legislative policy do not permit differentiation as to remedy.

How to effectuate policy—the adaptation of means to legitimately sought ends—is one of the most intractable of legislative problems. Whether proscribed conduct is to be deterred by *qui tam* action or triple damages or injunction, or by criminal prosecution, or merely by defense to actions in contract, or by some, or all, of these remedies in combination, is a matter within the legislature's range of choice. Judgment on the deterrent effect of the various weapons in the armory of the law can lay little claim to scientific basis. Such judgment as yet is largely a prophecy based on meager and uninterpreted experience. How empiric the process is of adjusting remedy to policy, is shown by the history of anti-trust laws in Texas and elsewhere. The Sherman Law originally employed the injunction at the suit of the government, private action for triple damages, criminal prosecution and forfeiture. Later the injunction was made available to private suitors.[5] In the case of combinations of common carriers the Sherman Law is qualified by the Interstate Commerce Act, *Keogh* v. *Chicago & N. W. Ry. Co.*, 260 U. S. 156, and, in the case of shipping combinations, by the Merchant Marine Act, *U. S. Navigation Co.* v. *Cunard S. S. Co.*, 284 U. S. 474. In its own groping efforts to deal with the problem of monopoly, the Texas legislature has in the course of nearly half a century invoked a dozen remedies.[6] When Iowa superimposed upon its general anti-trust law an additional penalty in the case of fire insurance combinations, this Court sustained

[5] See the Sherman Law, as amended, and supplementary enactments, in 15 U. S. C. §§ 1, 2, 4, 6, 9, 11, 15, 16, 21, 23, 25, 26.

[6] See Nutting *op. cit. supra*, note 1, pp. 296–97. For the remedies now prevailing, see Texas Penal Code, Art. 1635, 1637, 1638; Revised Civil Statutes, Art. 7428–7437.

the validity of the statute. *Carroll* v. *Greenwich Insurance Co.*, 199 U. S. 401.

Legislation concerning economic combinations presents peculiar difficulties in the fashioning of remedies. The sensitiveness of the economic mechanism, the risks of introducing new evils in trying to stamp out old, familiar ones, the difficulties of proof within the conventional modes of procedure, the effect of shifting tides of public opinion—these and many other subtle factors must influence legislative choice. Moreover, the whole problem of deterrence is related to still wider considerations affecting the temper of the community in which law operates. The traditions of a society, the habits of obedience to law, the effectiveness of the law-enforcing agencies, are all peculiarly matters of time and place. They are thus matters within legislative competence. To say that the legislature of Texas must give to farmers complete immunity or none at all, is to say that judgment on these vexing issues precludes the view that, while the dangers from combinations of farmers and stockmen are so tenuous that civil remedies suffice to secure deterrence, they are substantial enough not to warrant entire disregard. We hold otherwise. Here, again, we must be mindful not of abstract equivalents of conduct, but of conduct in the context of actuality. Differences that permit substantive differentiations also permit differentiations of remedy. We find no constitutional bar against excluding farmers and stockmen from the criminal statute against combination and monopoly, and so holding, we conclude that there was likewise no bar against making the exemption partial rather than complete.

*Affirmed.*

MR. JUSTICE MCREYNOLDS is of opinion that the judgment below should be reversed.