[No. C006810. Third Dist. July 9, 1991.]

FATHER DANIEL PATRICK DUFFY, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD et al., Defendants and Respondents;
CALIFORNIA CATHOLIC CONFERENCE, Real Party in Interest and
Respondent.

COUNSEL

James M. Mize for Plaintiff and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Floyd Shimomura and Ramon M. de la Guardia, Deputy Attorneys General, for Defendants and Respondents.

Raymond J. Leonardini for Real Party in Interest and Respondent.

OPINION

DAVIS, J.—

### INTRODUCTION

In this case we determine whether the Department of Corrections (Department) can limit certain publicly paid chaplaincy positions to persons ordained, accredited by and in good standing with the Roman Catholic Church without violating the establishment clause, the equal protection clause, or article I, sections 4, 7 and 8 of the California Constitution. We hold that it can.

### FACTUAL AND PROCEDURAL BACKGROUND

The minimum qualifications established by respondent Board of Corrections for the position of Catholic Chaplain require that an applicant be an "[o]rdained priest, duly accredited by and in good standing with the Roman Catholic Church, and approved by the Bishop of the diocese in which the [correctional] institution is located." The State Personnel Board's description of the duties and functions of a Catholic Chaplain is as follows: "A Catholic Chaplain, under direction, gives spiritual and moral guidance to State Institution residents; *conducts Roman Catholic religious services and instruction*; interviews and counsels mental patients, juvenile or adult offenders, or Veterans Home members on ethical and moral problems and spiritual matters; *celebrates Mass, administers the Sacraments, and conducts other Roman Catholic religious rites as needed by institution residents; organizes and instructs classes in Roman Catholic religion, ethics and sacred music*; cooperates with other staff members in carrying out the institution treatment program; supervises the arranging of programs conducted in the institution by visiting religious and allied groups; assists in problems involving welfare agencies where family help is needed; visits the sick; works with residents in

their group and club activities; counsels with families on problems involved in rehabilitation; explains and interprets the institution's religious program to community groups; serves, when designated, as a member of or consultant to the institution classification committee." [Italics added.]

In July 1984, appellant, Father Daniel Patrick Duffy, applied for the position of Catholic Chaplain at the Susanville prison facility. At the time he applied and was hired for this position, Father Duffy understood that the term "Catholic Chaplain" meant a Roman Catholic Chaplain. Father Duffy was appointed to the position of Catholic Chaplain on December 17, 1984. The Department then learned that the Roman Catholic Diocese of Sacramento would not issue a letter of authorization for Father Duffy's appointment because he was not a Roman Catholic priest in good standing. He was rejected from this position during his probationary period, on February 8, 1985.[1]

Father Duffy had been ordained as an order priest in the Roman Catholic Church in 1967 and was suspended from the priesthood in 1968. He married in 1970, divorced and remarried in 1979. In 1981, Father Duffy receive. a certificate of ministry from the Federation of Christian Ministries which authorized him to function as a minister and/or priest. In August 1984, he joined a non-Roman Catholic Christian denomination, the Ecumenical Catholic Diocese of the Americas, and was granted faculties to practice as a priest of that denomination. At the time he was hired, Father Duffy was accredited by and in good standing with the Ecumenical Catholic Diocese of the Americas and was approved by its Bishop in the Susanville area.

At the time of Father Duffy's appointment, the prison facility at Susanville had been without a Roman Catholic Chaplain for approximately one year.

Father Duffy appealed his rejection. On September 3, 1985, the administrative law judge (ALJ) for respondent State Personnel Board recommended that the rejection be set aside. The basis for this decision was that, while Father Duffy was not a Roman Catholic Chaplain, he was a Catholic Chaplain of another denomination and the appointment should not be limited to Roman Catholic Chaplains.

The State Personnel Board rejected the ALJ's proposed decision on September 16, 1985. After a hearing at which four board members could not

---

[1]Under Government Code section 19173, the Department has the authority to reject any employee "during the probationary period for reasons relating to the probationer's qualifications."

reach a decision, the case was reset for hearing before all five members of the board. In early 1986, the board granted requests to file amicus curiae briefs[2] and allowed various organizations to intervene as real parties in interest.[3] The case was remanded to the ALJ who unsuccessfully attempted settlement, then conducted further hearings on March 10, 11, 12, 13, 16 and 25, 1987.

The ALJ found that the "sole issue in this case is whether or not a competent religious leader working for the State as a chaplain can be terminated because he is not approved by a specific denomination." Concluding that he cannot, the ALJ recommended Father Duffy's reinstatement.

The board again rejected the ALJ's decision. In its decision of February 9, 1988, affirming Father Duffy's rejection during probation, the Board declined to void or modify the duly approved specifications which provide inmates with a Roman Catholic Chaplain.

On March 25, 1988, Father Duffy filed a petition for writ of mandate under Code of Civil Procedure section 1094.5 to compel the State Personnel Board to set aside its decision and to reinstate him to the position of Catholic Chaplain with backpay. The trial court denied the petition. On appeal, as he did in the trial court, Father Duffy contends that by funding a prison chaplaincy position which is limited to Roman Catholic priests in good standing with their diocese, the state violates the establishment clause, the equal protection clause, and article I, sections 4, 7, and 8 of the California Constitution.[4] He requests reinstatement, backpay, costs and attorney's fees.

## ESTABLISHMENT CLAUSES

The religion clauses of the First Amendment provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free

---

[2]Amicus curiae briefs were filed by the California Catholic Conference, the Associated Chaplains of California, the Ecumenical Catholic Dioceses of America, the Federation of Christian Ministries, the American Catholic Union and the Western Orthodox Catholic Church.

[3]The organizations which were allowed to intervene as real parties in interest included the California Catholic Conference, the Association of Catholic Bishops in California, the Associate Chaplains in California State Service (ACCSS) the Western Orthodox Catholic Church of California, The American Catholic Union (ACU), the Ecumenical Catholic Diocese of the Americas, the Federation of Christian Ministries (FCM), the State Advisory Committee on Institutional Religion (SACIR), and the Roman Catholic Bishop of Sacramento. The only real party in interest to appear on appeal is the California Catholic Conference, which concurred in the brief submitted on behalf of respondents.

[4]As noted by respondents, appellant also asserts a violation of Government Code section 19702 which prohibits discrimination in state civil service on the basis of religious creed. This was not raised in his petition below. The record is also bare of any indication that he filed a complaint of discrimination within one year of the alleged act as required by Government Code section 19702, subdivisions (f) and (g). Accordingly, we do not address this issue.

exercise thereof, . . ." ■ These constitutional concepts of religious autonomy which assure both free exercise and nonestablishment apply to state as well as federal action through the incorporation of their principles into the Fourteenth Amendment due process clause. (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 303 [84 L.Ed. 1213, 1217-1218, 60 S.Ct. 900, 128 A.L.R. 1352] [applying the free exercise clause to the states]; *Everson* v. *Board of Education* (1946) 330 U.S. 1 [91 L.Ed. 711, 67 S.Ct. 504] [applying the establishment clause to the states].)

Prior to 1974, article I, section 4 of the California Constitution provided in pertinent part: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be guaranteed in this State . . . ." As readopted by vote of the people on November 5, 1974 (in conjunction with its repeal as formerly worded), it now provides in part that "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed . . . . The Legislature shall make no law respecting an establishment of religion." The electorate adopted language almost identical with that of the federal establishment clause. Nonetheless, article I, section 24 provides in pertinent part: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." ■ When appropriate we may interpret rights set forth in our Constitution by a different standard than that applicable to similarly worded clauses in the federal Constitution so long as those rights extend equal or greater protection to those guaranteed by the federal Constitution. (*Feminist Women's Health Center, Inc.* v. *Philobosian* (1984) 157 Cal.App.3d 1076, 1086 [203 Cal.Rptr. 918].) Given the particular governmental practice at issue here, we find our analysis under the establishment clause equally applicable to our determination that article I, section 4 has not been transgressed.

In *Lemon* v. *Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105], the court noted that the authors of the First Amendment not only prohibited the establishment of a state church or a state religion, but "commanded that there should be 'no law *respecting* an establishment of religion.' . . . A given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." (Italics in original.) (*Id.* at p. 612 [29 L.Ed.2d at p. 755].) The court employed a three-part test to determine if the questioned statute passes constitutional muster: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . . ; [and] finally, the statute must not foster 'an excessive government entanglement with religion.' " (*Id.* at pp. 612-613 [29 L.Ed.2d at pp. 755-756].)

■ Although the *Lemon* test remains a useful analytical approach to resolving many establishment clause challenges to government action, (cf. *Tilton* v. *Richardson* (1971) 403 U.S. 672 [29 L.Ed.2d 790; 91 S.Ct. 2091]; *Widmar* v. *Vincent* (1981) 454 U.S. 263, 271-275 [70 L.Ed.2d 440, 448-451, 102 S.Ct. 269])[5] the Supreme Court has made clear that it is not the approach to be followed in all such cases. Soon after *Lemon* was decided the Supreme Court began describing the test as only a "guideline." (*Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756 [37 L.Ed.2d 948, 93 S.Ct. 2955].)[6] In *Mueller* v. *Allen* (1983) 463 U.S. 388, 394 [77 L.Ed.2d 721, 727, 103 S.Ct. 3062], the court described the test as "no more than [a] helpful signpos[t]." Although recognizing the continued usefulness of the three-part *Lemon* test, the court in *Lynch* v. *Donnelly* (1984) 465 U.S. 668 [79 L.Ed.2d 604, 104 S.Ct. 1355] [upholding the constitutionality of a city's crèche in a Christmas display] stated that "we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area." (*Id.* at p. 679 [79 L.Ed.2d at p. 613].) In so stating, the court cited two cases where it had declined to apply the *Lemon* test: *Marsh* v. *Chambers* (1983) 463 U.S. 783 [77 L.Ed.2d 1019, 103 S.Ct. 3330] and *Larson* v. *Valente* (1982) 456 U.S. 228 [72 L.Ed.2d 33, 102 S.Ct. 1673]. (465 U.S. at p. 679 [79 L.Ed.2d at p. 613].) In *Marsh*, the court upheld a state legislature's practice of opening each legislative day with a prayer by a chaplain paid by the state. Recognizing the long history of state accommodation of the religious nature of the people, the court in *Lynch* rejected a rigid absolutist view. "In each case, the inquiry calls for line-drawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application . . . . The line between permissible relationships and those barred by the Clause can no

---

[5]In *Tilton* v. *Richardson, supra*, 403 U.S. 672, five members of the court agreed that the religion clauses were not violated by grants to church-related colleges and universities for construction of buildings and facilities to be used exclusively for secular purposes, and eight members of the court agreed that the establishment clause was violated by provisions of the grants limiting the government's interest in covered facilities to a twenty-year period and thereby allowing use of the facilities for sectarian purposes after such period, since such provisions operated to effect a contribution of some value to a religious body.

In *Widmar* v. *Vincent, supra*, 454 U.S. at page 271 [70 L.Ed.2d at pages 448-449], the court applied the three-part *Lemon* test to hold that an "equal access" policy for the use of facilities at the university level does not violate the establishment clause when such a policy affords access to religious groups.

[6]In *Committee for Public Education* v. *Nyquist, supra*, 413 U.S. 756, eight members of the court held maintenance and repair provisions of grants to nonpublic schools were invalid under the establishment clause because they had a primary effect of advancing religion, since no attempt was made to restrict payments to the upkeep of facilities used exclusively for secular purposes; six members of the court held tuition reimbursement provisions invalid for much the same reasons; and six members of the court held the tax relief provisions for parents of nonpublic school children were insufficiently restricted to assure that they would not have the impermissible effect of advancing the sectarian activities of religious schools.

more be straight and unwavering than due process can be defined in a single stroke or phrase or test." (465 U.S. at pp. 678-679 [79 L.Ed.2d at p. 613].)

A rigid application of the *Lemon* test is particularly inappropriate when addressing government action intended to equalize religious burdens or otherwise to advance free exercise values. Legislation exempting religious observers from generally applicable government obligations would seldom, if ever, pass the "purpose" and "effects" prongs of the *Lemon* test since by definition, such legislation has a religious purpose and effect in promoting the free exercise of religion. (Tribe, Amer. Const. Law (2d ed. 1988) Rights of Religious Autonomy, §§ 14-8, 14-9, pp. 1201-1214.) On the other hand, judicial deference to all legislation that purports to facilitate the free exercise of religion would completely vitiate the establishment clause since any statute pertaining to religion can be viewed as accommodating free exercise rights. ■ The challenge posed here is how to define the proper establishment clause limits on voluntary government efforts to facilitate the free exercise of religion when such exercise is burdened by government itself, here the incarceration of state inmates.

Justice O'Connor, concurring in *Wallace* v. *Jaffree* (1985) 472 U.S. 38 [86 L.Ed.2d 29, 105 S.Ct. 2479] and *Corporation of Presiding Bishop* v. *Amos* (1987) 483 U.S. 327 [97 L.Ed.2d 273, 107 S.Ct. 2862], has provided a fitting analytical approach to resolving the tension between the two clauses in the setting before us here. Justice O'Connor's approach calls for the merger of the "purpose" and "effects" tests. The necessary first step is to recognize that such government action does have the effect of advancing religion. Here, although the ultimate objective of the chaplaincy may be secular in the sense that it seeks to enable Roman Catholic inmates to exercise their religious beliefs, its immediate purpose is to promote religion by making it available, albeit on a voluntary basis, to California's prison population. The effect of the chaplaincy positions is to advance the practice of a religious faith according to the tenets of a particular Christian denomination. (See *Katcoff* v. *Marsh* (2d Cir. 1985) 755 F.2d 223, 232 [upholding the Army chaplaincy program while concluding that the program does not meet the *Lemon* conditions].)

The necessary second step is to separate those benefits to religion that constitutionally accommodate the free exercise of religion from those that provide unjustifiable awards of assistance to religious organizations. In so doing the inquiry is "whether government's purpose is to endorse religion and whether the statute actually conveys a message of endorsement." (*Wallace* v. *Jaffree, supra*, 472 U.S. at p. 69 [86 L.Ed.2d at p. 52] (O'Connor, J., conc. in judgment).) Under this approach, the "purpose" inquiry does not stand as an independent test, capable of striking down government acts on its own. Rather, it is an additional, subordinate index of unconstitutionality. To

ascertain whether the statute conveys a message of endorsement, the relevant issue is how it would be perceived by an objective observer, acquainted with the text, history, and implementation of the government act. (*Corporation of Presiding Bishop* v. *Amos, supra,* 483 U.S. at p. 348 [97 L.Ed.2d at pp. 290-291] (O'Connor, J., conc. in judgment).)

The merger of the "purpose" and "effects" tests in this way reduces the likelihood of an erroneous conclusion about legislative motive, and eliminates the danger that a rigidly applied "purpose" test alone might invalidate laws whose effects are purely secular or advance free exercise values. It also helps explain cases where the Supreme Court has upheld long-established state practices that began in religion, such as Sunday closing laws, (*McGowan* v. *Maryland* (1961) 366 U.S. 420 [6 L.Ed.2d 393, 81 S.Ct. 1101]), and practices that acknowledge religion such as legislative prayers (*Marsh* v. *Chambers, supra,* 463 U.S. 783, and state-owned cr$'eches (*Lynch* v. *Donnelly, supra,* 465 U.S. at p. 668 [79 L.Ed.2d at p. 604]). (See Tribe, Amer. Const. Law, *supra,* §§ 14-9, 14-10, pp. 1204-1226.)

■ Applying the above analytical framework, we conclude that the state's provision for Catholic prison chaplains ordained, accredited by, and in good standing with the Roman Catholic Church does not convey a message of endorsement as perceived by an objective observer, acquainted with the text, history, and implementation of the government act at issue.

■ The determination of whether the objective observer will perceive an endorsement of religion " 'is not a question of simple historical fact. Although evidentiary submissions may help answer it, the question is, like the question whether racial or sex based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts.' " (*Corporation of Presiding Bishop* v. *Amos, supra,* 483 U.S. at p. 348 [97 L.Ed.2d at p. 291] (O'Connor, J., conc. in judgment) citing *Lynch* v. *Donnelly, supra,* 465 U.S. at pp. 693-694 [79 L.Ed.2d at pp. 622-624].)

■ Before the government action can be perceived as a permissible accommodation of religion, there must in fact be an identifiable burden on the exercise of religion that can be said to be lifted by government action. Here, the burden is readily apparent, since government incarceration prevents an inmate from worshiping with whom he chooses and at the location of his choice. The Department's purpose in providing inmates with the services of a Catholic chaplain ordained, accredited by, and in good standing with, the Roman Catholic Church is also apparent.

Although the practical effect of providing for Roman Catholic chaplains is the furthering of a particular religious creed among prisoners who voluntarily avail themselves of such chaplains' services, the Department's action is

more accurately characterized as an accommodation of a fundamental and constitutionally recognized need to freely exercise one's religious beliefs by prisoners whom government has deprived of the opportunity to practice their faith at places of their choice.[7]

■ It is established that government must afford reasonable opportunities to all inmates to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty. (*Cruz* v. *Beto* (1972) 405 U.S. 319, 322, [31 L.Ed.2d 263, 268, 92 S.Ct. 1079]; *In re Arias* (1986) 42 Cal.3d 667, 692 [230 Cal.Rptr. 505, 725 P.2d 664].) In *Arias* our Supreme Court recognized that the right to free religious expression in a penal institution embodies a precious heritage of our history. The court found that religion in such an institution is vastly important to society as well as the prisoner and subserves the rehabilitative function by providing an area within which the inmate may reclaim his dignity and reassert his individuality. (*Id.* at p. 700.)

---

[7]The question of which chaplains may be employed has been the subject of litigation by inmates asserting free exercise, establishment and equal protection violations by prison authorities. Paying money to prison chaplains of some faiths but not others has been held not to be an unconstitutional establishment of religion. (*Horn* v. *People of California* (E.D.Cal. 1968) 321 F.Supp. 961, 965; affd. (9th Cir. 1970) 436 F.2d 1375, cert. den. 401 U.S. 976 [28 L.Ed.2d 326, 91 P.2d 1198]; see also, *Johnson-Bey* v. *Lane* (7th Cir. 1988) 863 F.2d 1308.) An allegation that the state violated the free exercise clause by not supplying a Jewish inmate with a clergyman of his faith although Catholic and Protestant Chaplains were provided was characterized as "the antithesis of the cases arising under the Establishment Clause: This is not a charge that the state is supporting a religion, but a complaint that it is not." (*Gittlemacker* v. *Prasse* (3d Cir. 1970) 428 F.2d 1, 4.) *Gittlemacker* held that the free exercise clause is satisfied where the state provides an inmate with facilities for worship and the opportunity for any clergy to visit the institution. "But to go further and suggest that the Free Exercise Clause demands that the state not only furnish the opportunity to practice, but also *supply* the clergyman, is a concept that dangerously approaches the jealously guarded frontiers of the Establishment Clause." (*Id.* at p. 4.) The court held that allegations of discrimination were not factually warranted due to the small number of Jewish inmates at the prison facility and the institution's efforts to accommodate inmates by obtaining a Rabbi on a fee basis. (*Id.* at p. 5; see also, *Glasshofer* v. *Thornburgh* (E.D.Pa. 1981) 514 F.Supp 1242, affd. (3d Cir. 1982) 688 F.2d 821 [absence of Jewish Chaplains at institution did not violate free exercise clause where the number of Jewish inmates is very small and reasonable accommodations are made].) Where reasonable accommodation is made for the free exercise of an inmate's religion, equal protection is not violated even though inmates of some religions have more immediate access to their spiritual leaders who are state-employed. (*Allen* v. *Toombs* (9th Cir. 1987) 827 F.2d 563 [no violation where state-employed Catholic and Protestant chaplains are immediately available on request and state provided reasonable opportunities for Native American inmates to exercise their faith by allowing volunteer religious leaders to minister to them, even though their availability was limited]; *Card* v. *Dugger* (M.D.Fla. 1988) 709 F.Supp. 1098; affirmed (11th Cir. 1989) 871 F.2d 1023 [no violation where all prison chaplains were Southern Baptists and policy allowed regular contact visits with death watch inmates but prohibited contact visits by nonemployee Roman Catholic priests where reasonable opportunities afforded to exercise faith].)

The Legislature has by statute set forth the Department's responsibilities in this regard. Penal Code section 5009 provides: "It is the intention of the Legislature that all prisoners shall be afforded reasonable opportunities to exercise religious freedom." Similar statutes were enacted regarding local detention facilities and California Youth Authority facilities.[8]

To be strictly "neutral" in the context at issue here would reflect hostility to religion rather than accommodation. Justice Douglas amplified this concept in *Zorach* v. *Clauson* (1952) 343 U.S. 306, 314 [96 L.Ed. 954, 962, 72 S.Ct. 679] insisting that the state should "accommodate" religion, and "To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe . . . . But we find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence." (*Id.* at p. 314 [96 L.Ed.2d at p. 962].)

Justice Goldberg expressed a similar view in *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203 [10 L.Ed.2d 844, 83 S.Ct. 1560] (conc. opn.), by cautioning against any impression that neutrality meant hostility, urging that "untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it." (*Id.* at p. 306 [10 L.Ed.2d at pp. 905-906].)[9]

---

[8]Penal Code section 4027 provides: "It is the intention of the Legislature that all prisoners confined in local detention facilities shall be afforded reasonable opportunities to exercise religious freedom. [¶] As used in this section 'local detention facility' means any city, county, or regional facility used for the confinement of prisoners for more than 24 hours."

Welfare and Institutions Code section 1705 provides: "It is the intention of the Legislature that all persons in the custody of an institution under the supervision of the Department of the Youth Authority shall be afforded reasonable opportunities to exercise religious freedom."

[9]In concurring separately in *Abington School Dist.* v. *Schempp, supra*, 374 U.S. at pages 296-298 [10 L.Ed.2d at pages 900-901], Justice Brennan commented on the issue before us now: "There are certain practices, conceivably violative of the Establishment Clause, the striking down of which might seriously interfere with certain religious liberties also protected by the First Amendment.[ ] Provisions for churches and chaplains at military establishments for those in the armed services may afford one such example.[ ] The like provision by state and federal governments for chaplains in penal institutions may afford another example.[ ] It is argued that such provisions may be assumed to contravene the Establishment Clause, yet be sustained on constitutional grounds as necessary to secure to the members of the Armed Forces and prisoners those rights of worship guaranteed under the Free Exercise Clause. Since

Here, it is clear that California has made a determination that the number of Roman Catholic inmates in state prisons is great enough to justify the employment of full-time chaplains to minister to their needs, and thereby satisfy applicable constitutional and statutory mandates. (*Cruz* v. *Beto, supra,* 405 U.S. at p. 322 [31 L.Ed.2d at p. 268]; *In re Arias, supra,* 42 Cal.3d at p. 692; Pen. Code, § 5009.) The general policy of the Department regarding accommodation of prisoners' religious needs supports this conclusion. "Wardens, superintendents and regional parole administrators will make every reasonable effort to provide for the religious and spiritual welfare of all interested individuals and groups of inmates or parolees. Depending upon the number of inmates or parolees of the various faiths, chaplains may be employed on a full-time, part-time, or intermittent basis, or their services may be accepted on a volunteer nonpaid basis . . . ." (Tit. 15, Cal. Admin. Code, § 3210 (1982).)[10]

██ By necessity government has deprived members of the armed forces and inmates of the opportunity to practice their faith at places of their choice. To accommodate the fundamental and constitutionally recognized need of these persons to exercise their religious beliefs, government has long relied on the practical substitute of providing for chaplains representative of the religious creeds of those deprived of their freedom and placed in their care.

The employment of chaplains has been an accepted accommodation to the religious needs of the military and inmates for generations. Military chaplains have been provided at least since the 5th century when the person designated to care for the French king's religious needs during a military campaign and carry his cloak into battle was designated the cappellani or chaplain. (The New Encyclopedia Britannica (15th ed. 1986) vol. 3, p. 93.)

government has deprived such persons of the opportunity to practice their faith at places of their choice, the argument runs, government may, in order to avoid infringing the free exercise guarantees, provide substitutes where it requires such persons to be." (Fns. omitted.)

[10]It was undisputed that the position of Catholic Chaplain at Susanville was vacant for a year prior to Father Duffy's appointment. Pointing this out, Father Duffy makes reference to the declining number of Roman Catholic priests and the Roman Catholic Diocese's apparent inability to fill the position. He asserts that he performed his job competently as evidenced by a petition in his favor signed by Catholic inmates at Susanville. He argues that it is better for the inmates to have him than to have no one. While we might agree with this assertion as a philosophic matter, it is not the role of a job applicant to assert the uniquely personal rights to religious freedom of prison inmates. As Father Duffy himself argues, in this context the free exercise clause protects the inmate, not the minister or the religious institution. If the religious needs of Catholic inmates at Susanville are not being accommodated due to the Department's inability to hire or provide a Roman Catholic chaplain, or if Ecumenical Catholics have special religious needs which are not being met by volunteer ministers, those inmates may assert the violation of their free exercise rights directly. The accommodation of those rights is not relevant to Father Duffy's qualifications for the chaplaincy position under consideration.

In the first gathering of the yeomanry at Lexington and Concord, as well as afterward in the assembling of the army around Bunker Hill, government chaplains played an important part, not merely in the discharge of their religious duties, but as patriots—haranguing the soldiers, and even leading them into battle. (Headley, Chaplains and Clergy of the Revolution (1864) pp. 58-59.) When George Washington assumed command of the army at Cambridge, he found chaplains attached to the different regiments sent from the various colonies, some of them volunteers without pay, and others regularly appointed by the Provincial Congress. (*Id.* at p. 60.) On August 15, 1775, Washington reported that there were 15 paid chaplains serving in the army. On the last day of December of that year Washington wrote to the Continental Congress and requested that the pay of his chaplains be increased and that he be permitted to appoint one chaplain to every two regiments. (*Id.* at pp. 62-63.)

Likewise, prison chaplains have been a fixture in the public's perception of prisons and the treatment of inmates since at least the 16th century (Shakespeare, The Tragedy of Richard the Third (1594) Act IV, Scene 3, line 29), and have continued to be recognized in conjunction with modern accounts of prison life. (Yee, The Melancholy History of Soledad Prison, In Which a Utopian Scheme Turns Bedlam (1973) p. 38; Liebert, Behind Bars, What a Chaplain Saw in Alcatraz, Folsom, and San Quentin (1965); Bonn, Gates of Dannemora (1951); Duffy, The San Quentin Story (1950) p. 98; Clay, The Prison Chaplain (1861) p. 27.)

Given our shared experience with and knowledge of governmental chaplaincies both as they exist today and the institutional role they have long filled, the judicial directives compelling accommodation set forth in *Cruz* v. *Beto, supra,* 405 U.S. at page 322 [31 L.Ed.2d at page 268], and *In re Arias, supra,* 42 Cal.3d at page 692, and the clearly expressed purpose set forth in the Penal Code and in the Department's regulations, it is a fanciful notion to suggest that such chaplaincies convey to an objective observer a message of endorsement that the establishment clause and article I, section 4 are designed to curtail. On the contrary, provision of such chaplaincies for priests ordained, accredited by and in good standing with the Roman Catholic Church reflects a posture that is detached, accommodating, accepting and benevolent. The message conveyed is that government has an obligation to, and through prison chaplaincies does, afford reasonable opportunities to inmates to exercise the religious freedom guaranteed by the First and Fourteenth Amendments.

It remains for us to determine whether the Department's practice of letting the Roman Catholic Church decide whether a priest is theologically and ecclesiastically qualified to serve as a Catholic chaplain excessively

entangles government with religion. The Department requires that all applicants for the position be ordained, accredited by and in good standing with the Roman Catholic Church. The Department independently decides which, among all applicants meeting this threshold criteria, will be hired.

Justice O'Connor would fold the entanglement inquiry set out in *Lemon* in with the "effects" test. (*Aguilar* v. *Felton* (1985) 473 U.S. 402, 429-430 [87 L.Ed.2d 290, 310-311, 105 S.Ct.3232] (O'Connor, J., dis.).) "Pervasive institutional involvement of church and state may remain relevant in deciding the *effect* of a statute which is alleged to violate the Establishment Clause [citation], but state efforts to ensure that public resources are used only for nonsectarian ends should not in themselves serve to invalidate an otherwise valid statute. The State requires sectarian organizations to cooperate on a whole range of matters without thereby advancing religion or giving the impression that the government endorses religion. [Citation.] If a statute lacks a purpose or effect of advancing or endorsing religion, I would not invalidate it merely because it requires some ongoing cooperation between church and state or some state supervision to ensure that state funds do not advance religion." (*Id.* at p. 430 [87 L.Ed.2d at p. 311].) Regardless whether the entanglement inquiry is conducted as part of the "effects" test as recommended by Justice O'Connor or independently, we find that the result is the same.

Rather than constituting excessive entanglement, we find the Department's practice of letting the Roman Catholic Church decide which priests are theologically and ecclesiastically qualified to serve as Catholic chaplains a safeguard against the doctrinal entanglement in religious issues prohibited by the establishment clause. Accordingly, the practice protects rather than subverts First Amendment values.

█ Doctrinal entanglement involves government in religion's very spirit, in its decisions on core matters of belief and ritual. The prohibition against doctrinal entanglement reflects the conviction that government must never take sides on religious matters, a conviction "requiring on the part of all organs of government a strict neutrality toward theological questions." (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. at p. 243 [10 L.Ed.2d at p. 870] (Brennan, J., conc.).) At the very heart of First Amendment theory is the proposition that "[t]he law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." (*Watson* v. *Jones* (1872) 80 U.S. (13 Wall.) 679, 728 [20 L.Ed. 666, 676].)

The doctrine of judicial deference to a religion's internal decisionmaking organs has deep roots in history. The New Testament provided early precedent for civil deference to religious authority on ecclesiastical ques-

tions.[11] John Adams attributed the settlement of America to "a hatred, a dred, a horror, of the infernal confederacy" between civil and ecclesiastical law. ("A Dissertation on the Feudal and Canon Law," in 3 Works 451 (1851).) In his "Memorial and Remonstrance Against Religious Assessments," James Madison labeled the suggestion that "the Civil Magistrate is a competent Judge of Religious truth" an "arrogant pretension falsified by the contradictory opinion of Rulers in all ages, and throughout the world." (II The Writings of James Madison 183-91 (G. Hunt ed. 1901).)

The United States Supreme Court has repeatedly made clear that the First Amendment prohibits civil courts from resolving issues on the basis of religious doctrine or practice—matters which concern theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a religion to the standard of morals required of them. (*Watson* v. *Jones, supra*, 80 U.S. (13 Wall.) at pp. 733-734 [20 L.Ed. at p. 678]; *Serbian Orthodox Diocese* v. *Milivojevich* (1976) 426 U.S. 696, 713-716 [49 L.Ed.2d 151, 165-167, 96 S.Ct. 2372]; *Jones* v. *Wolf* (1979) 443 U.S. 595, 602 [ 61 L.Ed.2d 775, 783-784, 99 S.Ct. 3020].) ▮▮ The First Amendment would just as clearly prohibit the Department from making such determinations regarding the threshold qualifications of priests seeking to serve as Catholic prison chaplains.

A similar argument alleging excessive entanglement was rejected in *Turner* v. *Parsons* (E.D.Pa. 1985) 620 F.Supp. 138, affirmed (3d Cir. 1986) 787 F.2d 584, certiorari denied 476 U.S. 1160 [90 L.Ed.2d 722, 106 S.Ct. 2280]. In *Turner*, an applicant who was denied a position as Catholic Chaplain with the Veterans Administration argued that chaplaincy candidates from other denominations were only required to secure endorsement from their immediate superiors, while Catholic applicants were required to be approved by the Military Vicariate, a central agency of the church. Such a requirement of prior church approval of chaplaincy candidates was alleged to permit excessive entanglement in violation of *Lemon*. *Turner* approved the establishment clause analysis in *Katcoff, supra,* 755 F.2d 223 (upholding the constitutionality of the Army's chaplaincy program), which examined the free exercise and establishment clauses in tandem and held that in the unique setting of military life the military has a duty to hire chaplains to protect the free exercise rights of its servicepeople. ▮▮▮ While the act of hiring under such circumstances does not constitute excessive entanglement, the court could not "conceive of any greater interference or entanglement a government could launch than to dictate who may or may not

<hr>

[11]See Acts 18: 12-16, describing Gallio's refusal, as proconsul of Achaia, to judge a claim that Paul " 'is inducing people to worship God in ways that are against the law.' " Because it was a matter of religious law, Gallio told Paul's accusers, " 'you may see to it yourselves; I have no mind to be a judge of these matters.' And he had them ejected from the court."

represent a religious faith to its flock." (*Turner, supra,* 620 F. Supp. at p. 142.)[12]

The *Turner* analysis is equally applicable to the tension between the free exercise and establishment clauses in the state prison system. If the state were to determine the theological and ecclesiastical qualifications for a person to act as a Roman Catholic priest in the state prison system, it would be engaging in the type of doctrinal entanglement with religion that the establishment clause and article I, section 4 prohibit.

The record below establishes that the only means by which Roman Catholic inmates can exercise fundamental aspects of their religious life such as instruction, mass, receipt of sacraments, and other religious rites, is by having access to a priest ordained, accredited by and in good standing with the Roman Catholic Church. The state's current requirements for Catholic chaplaincy positions assure such access for Roman Catholic inmates and we find that they do not violate the establishment clause or article I, section 4 in doing so.

### EQUAL PROTECTION

Father Duffy argues that as a priest in good standing of the Ecumenical Catholic Church of the Americas he is denied equal protection under the law in violation of the Fourteenth Amendment of the United States Constitution and article I, section 7 of the California Constitution by the Department's practice of limiting the position of Catholic Chaplain to those priests who adhere to one particular religious creed, namely that of the Roman Catholic Church.

Father Duffy points to no authority which suggests that the California equal protection clause should be interpreted to place greater restrictions on bona fide programs to accommodate the religious liberties of prisoners than are afforded by the Fourteenth Amendment. We find no basis to so hold. Our Supreme Court has, on some prior occasions, departed from applicable federal precedents in reliance upon state constitutional principles. (Eg. *Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 469 [156 Cal.Rptr. 14, 595 P.2d 592]; *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929]; *People* v. *Brisendine* (1975) 13 Cal.3d 528, 545 [119 Cal.Rptr. 315, 531 P.2d 1099].) Yet in the specific context of

---

[12]It is established that, in the absence of fraud, collusion, or arbitrariness, the decisions of church authorities regarding the qualifications of their chaplains is conclusive. (*Gonzalez* v. *Roman Catholic Archbishop* (1929) 280 U.S. 1 [74 L.Ed. 131, 50 S.Ct. 5]; *McClure* v. *Salvation Army* (5th Cir. 1972) 460 F.2d 553.)

minority advancement programs our Supreme Court has concluded that the state Constitution imposes no greater restrictions than similar guarantees provided by the federal charter. (*DeRonde* v. *Regents of University of California* (1981) 28 Cal.3d 875, 889-890 [172 Cal.Rptr. 677, 625 P.2d 220]; *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257, 284-285 [161 Cal.Rptr. 475, 604 P.2d 1365].) In *DeRonde* the court held that in the context of minority advancement ". . . both for practical and policy reasons, we do not lightly disregard pertinent decisions of the United States Supreme Court resolving issues of nationwide interest and importance. Uniform standards in the critical area of educational opportunity appear desirable." (28 Cal.3d at p. 890.)

Equally important and in need of uniform standards are the constitutionally and statutorily recognized interests at issue here. (See *Cruz* v. *Beto, supra*, 405 U.S. at p. 322 [31 L.Ed.2d at p. 268]; *In re Arias, supra*, 42 Cal.3d at p. 692; Pen. Code, §§ 4027, 5009; Welf. & Inst. Code, § 1705.)[13] Accordingly we will apply the same tests for equal protection under both clauses when, as here, we confront a bona fide program of the government to accommodate the religious practices of its inmates. (See *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 15, fn. 13 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], [stating "[t]he California and federal tests for equal protection are substantially the same. (*County of L.A.* v. *Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 389 [196 P.2d 773].)"].)

■ The "equal protection" provisions of the federal and state Constitutions protect only those persons similarly situated from invidiously disparate treatment. (*Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505]; 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, §§ 599, 603, pp. 51, 57.) Prerequisite to a meritorious claim under an equal protection analysis is a showing that the state has imposed a classification which affects two or more similarly situated groups. (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549] [holding that adults convicted in the criminal courts and sentenced to prison and youths adjudged wards of the juvenile courts and committed to the Youth Authority are not similarly situated]; *Respers* v. *University of Cal. Retirement System* (1985) 171 Cal.App.3d 864, 875-876 [217 Cal.Rptr. 594] [holding employees of the University of California and employees of other agencies of government are not similarly situated in a review of the procedures used by the university's retirement board]; *William Dal Porto & Sons, Inc.* v. *Agricultural Labor Relations Bd.* (1987) 191 Cal.App.3d 1195, 1214-1215 [237 Cal.Rptr. 206] [holding employers and labor organizations are not similarly situated in a review of the applicability of Lab. Code § 1160.3];

---

[13]See text on pages 12-14, and footnote 7, *ante*, page 13.

*American Federation of Teachers College Guild* v. *Board of Trustees* (1976) 63 Cal.App.3d 800, 804-805 [134 Cal.Rptr. 111] [holding no equal protection violation where teachers in community college district had to retire at age 65 while teachers in state universities and colleges had to retire at age 67]; *Saal* v. *Workmen's Comp. Appeals Bd.* (1975) 50 Cal.App.3d 291, 299-300 [123 Cal.Rptr. 506] [holding equal protection not violated where more favorable worker's compensation benefits paid to campus policemen hired by University of California]; *California State Employees' Assn.* v. *Flournoy* (1973) 32 Cal.App.3d 219, 236-238 [108 Cal.Rptr. 251] [holding no equal protection violation where academic employees of state universities and colleges where denied pay raise granted to other public employees].) "The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." (*Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 60 S.Ct. 879, 130 A.L.R. 1321].)

 Father Duffy's contention fails at this first step; to prevail on his equal protection claim Father Duffy must demonstrate that the challenged state action results in disparate treatment of persons who are similarly situated *with regard to a given law or regulation's legitimate purpose.* (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645]; see also Tussman and tenBroek, *The Equal Protection of the Laws* (1949) 37 Cal.L.Rev. 341.) The purpose of the Department's regulations at issue here is to provide chaplains that can meet the unique religious needs of the Roman Catholic prisoners in state prisons. Reasonable efforts to do so are required by the federal and state Constitutions (*Cruz* v. *Beto, supra,* 405 U.S. at p. 322 [31 L.Ed.2d at p. 268]; *In re Arias, supra,* 42 Cal.3d at p. 692), by statute (Pen. Code, § 5009),[14] and by regulation (tit. 15, Cal. Admin. Code, § 3210 (1982).[15] As the trial court correctly found based on testimony given by Roman Catholic church officials, a priest in good standing of the Ecumenical Catholic Church of the Americas simply cannot provide services that are fundamental to a Roman Catholic inmate's ability to exercise his religious beliefs. Only priests ordained, accredited by and in good standing with the Roman Catholic Church are able to instruct, administer the sacraments, and conduct mass and other important religious rites of the Roman Catholic Church. Priests of the Ecumenical Catholic Church of the Americas, such as Father Duffy, are not similarly situated to such Roman Catholic priests in regard to the legitimate purpose of the Department's regulation. Father Duffy has therefore not been denied equal protection.

---

[14]See text *ante,* pages 13-14.
[15]See text *ante,* page 15.

CALIFORNIA CONSTITUTION

 Finally, the Department's minimum qualifications do not violate article I, section 8 of the state Constitutition of the California Constitution which provides that a "person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of . . . creed, . . ."

Article I, section 8 of the State Constitution "does not require full equality of treatment of all employees' religious practices under all circumstances." (*Rankins* v. *Commission on Professional Competence* (1979) 24 Cal.3d 167, 178 [154 Cal.Rptr. 907, 593 P.2d 852].) It merely "forbids disqualification of employees for religious practices unless reasonable accommodation by the employer is impossible without undue hardship." (*Id.* at p. 174.) The court in *Rankins* noted that section 8 does not prohibit dismissal from employment where the religious "adherence created 'an inability to perform the tasks required by a particular occupation,' . . . (See *Sail'er Inn* v. *Kirby, supra,* 5 Cal.3d 1, 9 . . . .)" (*Id.* at p. 172.) Although *Sail'er Inn* construed former California Constitution article XX, section 18, which prohibited disqualification from employment based on sex, that language was broadened by the 1974 adoption of article I, section 8, to prohibit other forms of discrimination, including "creed." (24 Cal.3d at p. 172, fn. 4.)

As noted by the trial court, Father Duffy "simply cannot perform the tasks of conducting Roman Catholic services, Mass, administration of the Sacraments or other Roman Catholic religious rites, a fact which he concedes." Accordingly, his rights under California Constitution article I, section 8 were not violated.

DISPOSITION

The minimum qualification requiring priests to be ordained, accredited by, and in good standing by the Roman Catholic Church is not unconstitutional under state or federal Constitutions and is therefore not void *ab initio.* Because Father Duffy cannot meet these minimum qualifications, the judgment is affirmed. Respondents are awarded costs of appeal.

Carr, J., concurred.

**BLEASE, Acting P. J.**—I concur in the judgment. I write separately because I think no difficult constitutional issues have been tendered.

Father Duffy seeks reinstatement to the position of prison chaplain, from which he was dismissed for failure to meet standards of ordination and accreditation established by the Roman Catholic Church and adopted by the Department of Corrections. He challenges the right of the state to set such

standards, arguing that the establishment and equal protection clauses of the federal Constitution preclude such criteria when different criteria are applied to the selection of Protestant and Jewish chaplains.

Father Duffy cannot challenge the authority of the state to provide for paid prison chaplains since he is seeking just such a position. The lengthy discussion in the majority opinion on that point is therefore misplaced.

The authority of the state to pay prison chaplains, free of the restraints of the establishment clause, if any, derives solely from the free exercise rights of inmates whose religious practices have been impaired by incarceration. (See *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 296-298 [10 L.Ed.2d 844, 900-901, 83 S.Ct. 1560], conc. op. of Brennan, J.) The constitutional measure of the criteria for the selection of chaplains to minister to such inmates is whether their free exercise rights are thereby reasonably fostered. The state may not discriminate among religions in the payment of chaplains as, for example, by choosing to pay chaplains only from established denominations. (See *Young Life Campaign* v. *Patino* (1981) 122 Cal.App.3d 559 [176 Cal.Rptr. 23].) It must act on the basis of neutral standards regarding the size of the inmate population to be served and the demonstrated need for paid chaplains to foster the free exercise rights of inmates. The equal protection clause comes to bear if the state departs from such standards.

Father Duffy's only challenge is that the inclusive standards employed in the selection of paid chaplains for Protestant and Jewish inmates must apply to the position of Catholic chaplain so as to encompass Ecumenical Catholics. Father Duffy has no personal constitutional right to the position of paid prison chaplain. His right, if any, is derivative of the rights of the inmates to whom he would minister. He cannot assert the rights of Roman Catholic inmates. And he does not assert the rights of Ecumenical Catholic inmates and seek the creation of a paid chaplaincy ministering to them by claiming that they constitute a distinct group of believers, numerous enough to be comparably situated to that of Roman Catholics. He is therefore ill positioned to challenge the state's deference to the criteria of the Roman Catholic Church for the selection of a priest to minister to inmates of the Roman Catholic faith.

The authority of the state, if any, to pay chaplains in aid of the free exercise rights of inmates does not justify an invasion of the very rights to be protected. The interference by the state with the criteria by which a religious denomination may choose those who are to minister to inmates of their faith would entangle the state in the practice of religion in precisely the manner

forbidden by the free exercise clause. (See, e.g., *Serbian Orthodox Diocese* v. *Milivojevich* (1976) 426 U.S. 696 [49 L.Ed.2d 151, 96 S.Ct. 2372].) That Protestants or Jews may adopt more inclusive criteria for the selection of a paid chaplain than the Roman Catholic Church is an aspect of their religious freedoms. The state may not impose the choice of one upon the other.

A petition for a rehearing was denied August 2, 1991, and appellant's petition for review by the Supreme Court was denied October 3, 1991.