Paul Brendan O'BAR, Plaintiff–Appellee,

v.

J.C. PINION, Sr., Joseph L. Hamilton,
W.V. Ritchie, R. Alan Harrop, J. Boyd
Bennett, Defendants–Appellants,

and

David L. Murphy, Superintendent,
Attorney General of the State of
North Carolina, Defendants.

No. 91–7526.

United States Court of Appeals,
Fourth Circuit.

Argued June 4, 1991.

Decided Dec. 4, 1991.

As Amended Dec. 31, 1991.

Howard Edwin Hill, Asst. Atty. Gen., North Carolina Dept. of Justice, Raleigh, N.C., argued (Lacy H. Thornburg, Atty. Gen., N.C. Dept. of Justice, on brief), for defendants-appellants.

Michael Gray Gibson, Charlotte, N.C., argued, for plaintiff-appellee.

Before WILKINSON and NIEMEYER, Circuit Judges, and JOSEPH F. ANDERSON, Jr., District Judge for the District of South Carolina, sitting by designation.

## OPINION

NIEMEYER, Circuit Judge:

When Paul Brendan O'Bar, a North Carolina inmate, was removed from a work release program and placed in administrative segregation by state officials, he sued the officials in their individual capacities under 42 U.S.C. § 1983 (1988), based on allegations that their actions were prompt- ed by the complaint of a member of the public and not by any disciplinary infraction. He contended that the actions taken by state officials 1) denied him equal protection of the laws in violation of the Fourteenth Amendment, 2) denied him a liberty interest without due process in violation of the Fourteenth Amendment, 3) subjected him to cruel and unusual punishment in violation of the Eighth Amendment, and 4) denied him the right to work and enjoy the fruits of his labor in violation of the North Carolina Constitution. O'Bar was serving a six-year sentence for the multiple stabbing of his former girlfriend and, less than six months after the stabbing, had been placed on work release within five miles of the victim's home. When the girlfriend's mother wrote to state officials to complain and express fear, an investigation was undertaken which resulted in O'Bar's reclassification.

The North Carolina state officials filed a motion for summary judgment on the substantive issues, in which they also claimed official immunity. O'Bar filed a cross motion for summary judgment. On January 10, 1991, the district court entered three interlocutory orders granting the summary judgment motion of the North Carolina state officials on the Eighth Amendment claim; granting O'Bar's summary judgment motion on the equal protection claim with respect to defendant Joseph Hamilton, who made the operative decisions for the state; directing that the equal protection claim be scheduled for trial on the issue of damages; and denying all other motions for summary judgment. The North Carolina state officials appealed, basing appellate jurisdiction on the district court's denial of their immunity defenses under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *See Mitchell v. Forsyth*, 472 U.S. 511, 526–27, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985) (holding that order denying qualified immunity is a final decision under 28 U.S.C. § 1291). For the reasons that follow, we reverse and remand for the entry of judgment dismissing all claims.

## I

In the early morning of September 14, 1987, in Charlotte, North Carolina, when Julie Riggs told O'Bar that she wanted to break off their relationship, O'Bar stabbed her with a butcher knife about the head, chest and back over thirty times, inflicting nine potentially fatal wounds. As he stabbed her, he stated, "I love you so much, but I just can't live without you and I'd rather meet you in hell than to be without you so I am going to meet you in hell." Two months later, on November 17, 1987, O'Bar pled guilty in the Superior Court of Mecklenburg County to assault with a deadly weapon with the intent to kill and was sentenced to six years imprisonment. Shortly after O'Bar's conviction the Office of the District Attorney for Mecklenburg County notified the North Carolina Parole Commission that O'Bar had been "identified for special prosecutorial effort and is considered to be one of the 10 percent of our most active offenders with the highest potential to recidivate." John Wolfe, the prosecutor in the case, also wrote on December 8, 1987:

> This office and the citizens of Mecklenburg County oppose anything that would allow this man's release prior to his max-out date. This is not the first time O'Bar has attacked this woman and I have no doubt he will try to kill her again. I realize, of course, that you have no control or responsibility for his actions upon his release, I am just asking you to delay his release as long as possible to allow Miss Riggs (the victim in this case) to establish a new life some place else.

Attached to this letter was a letter from the victim, Julie Riggs, explaining her concerns about O'Bar based not only on the most recent attack but also on a previous occasion on which he had threatened her with a knife. Riggs requested that he serve as much of his sentence as possible to allow her time to relocate.

A few months later, in February 1988, the victim's mother, Elizabeth Riggs, also wrote to the Parole Commission imploring them not to release O'Bar. She wrote:

> My daughter Julie was nearly murdered by Paul O'Bar on September 14, 1987, during a seven-minute attack which took place in his house and in the gutter and front yard of a house six or seven houses down the street from his house.
>
> This attack is the second attempt on my daughter's life by Paul O'Bar, with a knife as a weapon. The first incident took place a year ago.
>
> Please, please do not recommend Paul O'Bar for early release-parole. He is 6' 5" tall and weighs nearly 200 pounds. He has a very high I.Q. My daughter Julie is 5' 8½" tall, and weighs 111 pounds. She is only alive by the grace of God, and because she fell into the yard of an offduty police officer's, who subsequently heard her cries for help and fired shots at Paul O'Bar as he was "finishing her off."
>
> \* \* \* \* \* \*
>
> I implore you to do what you can to help Julie stay alive, by helping keep Paul O'Bar in prison the entire six years of his sentence.

The various letters from the Mecklenburg County District Attorney's Office, Julie Riggs, and Elizabeth Riggs were received by the Parole Commission and placed in O'Bar's file located in the Combined Records Section of the Department of Correction in Raleigh.

O'Bar was originally incarcerated at the Alexander Correctional Center in Taylorsville, North Carolina. When he was transferred to Iredell Correctional Center in Statesville, North Carolina, the administrator there, J.C. Pinion, who was facing pressures to meet work release quotas, reviewed O'Bar's local file to determine whether he should be placed on work release. At the time of Pinion's review, however, the file consisted only of a locally produced computer printout stating that O'Bar had no prior convictions and that he was sentenced to the relatively short term of six years. Pinion made no attempt to obtain and review the information contained in the central file in Raleigh. Based on the limited information, Pinion recommended that O'Bar be placed on work re-

lease. On March 10, 1988, O'Bar began participating in work release at a service station in Charlotte, approximately five miles from the home of his victim, Julie Riggs. He worked at the station without incident until April 11, 1988, when he was removed from work release and placed in administrative segregation for further evaluation, for no reason apparent to him.

What O'Bar did not know was that in early April 1988, when Elizabeth Riggs learned that he had been placed on work release only five miles away, she wrote the Governor of North Carolina describing the crime, the injury to her daughter, and the fear that she and her family held. In the letter she asked rhetorically, "How can the Department of Corrections be so negligent as to place this clearly unstable, dangerous, violent, would-be murderer within five miles of his intended victim, where he can *easily* play the murder scene out to its completion at any time?" She requested that the Governor intervene to move O'Bar far from Mecklenburg County "before it is too late." To the letter she attached pictures of Julie Riggs taken before and after the assault. Elizabeth Riggs also contacted the office of the Attorney General of North Carolina to convey a similar message.

The Governor's office forwarded Elizabeth Riggs' letter to the Director of the Division of Prisons, defendant Joseph Hamilton, and called him to inform him of Riggs' concerns and to request that Hamilton look into the matter. The Attorney General's office also wrote Hamilton expressing concerns about the situation and requesting that O'Bar "be removed from work release and/or transferred to another area of the state."

After receiving the letters from Elizabeth Riggs and the Attorney General's office, Hamilton decided to conduct a comprehensive review of O'Bar's classification to determine whether he constituted a threat to the victim and whether it was appropriate to have placed him on work release in Charlotte. In the interim, as a precautionary measure, he removed O'Bar from work release and ordered his transfer for evalua-

tion. Hamilton states that it appeared to him then that O'Bar constituted an escape risk and that he was a potential threat to Julie Riggs and the community.

Thus, on April 11, 1988, when O'Bar returned from work release at the service station to the Mecklenburg I unit, he was placed in handcuffs and leg shackles and taken to the sergeant's office where defendant Superintendent Baxter Bridges told O'Bar that he was being removed from work release and was being transferred from the Charlotte area. O'Bar was transferred to Rowan Correctional Center in Salisbury where he was placed in administrative segregation for nine days to complete a psychological evaluation and a review of his classification. The transfer to Rowan was necessary because Charlotte had no staff psychologists.

Pursuant to Hamilton's request for a comprehensive review, he received reports and information from a number of persons. Nevelle O. Jones, the Director of Classification for the Division of Prisons, reported that O'Bar had been arrested in 1986 and had received a suspended sentence for assaulting a law enforcement officer and resisting arrest after finding his girlfriend (then also Julie Riggs) in bed with someone and assaulting them both; that after his arrest for the current offense O'Bar tried to commit suicide by cutting his wrists with a chain saw and was committed to Dorothea Dix Hospital for psychological treatment; and that O'Bar had a history of severe depression and substance abuse. Jones concluded:

> Other than the history reported by the inmate, no additional information was available to prison authorities either at admission or during subsequent assignment reviews. Information was however received by the Parole Commission, reviewed and placed in the inmate's central file [*which*] was not available to local decision makers. Given the nature of the inmate's crime and the structure of the imposed sentence, nothing unusual or nothing indicative of any imminent threat was noted during prison intake processing or during subsequent assignment re-

views. The inmate's history was generally known but from the information available no imminent risk to the victim or to other members of the community at large was seen.

Hamilton also received memoranda from E. Edwin Stem, Manager of District I in the South Piedmont Area, and from John Mullinax, Administrator of the South Piedmont Area, both of whom suggested that O'Bar be returned to work release, although Mullinax suggested that the work release occur in another county. Finally, Hamilton received a psychological evaluation of O'Bar by Andrew Niven, who determined:

[O'Bar's] actions appear totally related to this one relationship [with Julie Riggs]. Paul does not appear to be an assaultive threat to the general public. It would be my judgment that this behavior would not occur again unless Paul would, again, become highly involved in a very emotional situation with a female, be rejected by her and, again, be under the influence of some type of mood altering substance. . . . Therefore, in making recommendations for programming within the Division of Prisons, I would suggest that we *provide as much structure as pos[s]ible.* Therefore, the following recommendations are being made. I feel that Paul should continue on work release. . . . *Paul should have no contact with the victim whatsoever, and this should be closely monitored.* Because of his history of alcohol abuse, he should be closely monitored for any abuse that might occur outside of the prison environment.

(emphasis added). Believing that Niven's evaluation of O'Bar was contradictory because it suggested that the prison provide as much structure as possible and at the same time recommended that O'Bar be continued on work release, Hamilton sought the advice of defendant Dr. R. Alan Harrop, the Director of Psychological and Mental Health Services for the Division of Prisons. Dr. Harrop agreed with Hamilton's assessment that Niven's report was contradictory and advised Hamilton that, in his professional judgment, O'Bar remained a threat to Julie Riggs and the community,

especially if O'Bar were to ingest alcohol or drugs.

From a review of the information available to him, which included the reports discussed above as well as O'Bar's central file in Raleigh and a discussion with Elizabeth Riggs, Hamilton concluded that it had been a mistake to place O'Bar on work release five miles from his victim, six months after he assaulted her. Hamilton thus terminated O'Bar's administrative segregation, continued the suspension of his work release, transferred him from Rowan to Davidson Correctional Center in Lexington, and maintained his security classification at a level that would keep him from leaving the prison grounds for at least six months. He also requested that Dr. Harrop formulate a substance-abuse treatment program for O'Bar. The program that Dr. Harrop recommended required O'Bar's transfer to Wayne Correctional Center in Goldsboro, a medium security facility, so that he could participate in its four-week substance-abuse treatment program, then the only one of its kind within the state's Department of Correction. The transfer of O'Bar to Wayne, however, required a change in his security level from minimum custody to medium to comport with the security level at the new facility.

O'Bar completed the program as formulated by Dr. Harrop, and in December 1989 he was released on parole.

## II

■ Neither party questions our jurisdiction on appeal, and neither has articulated the scope of our review when a final judgment has not been entered by the district court. The orders of the district court on the motions for summary judgment did not adjudicate "all the claims and the rights and liabilities of all the parties," Fed. R.Civ.P. 54(b), but they did deny defendants' motion for summary judgment with respect to qualified immunity under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Although the district court's ruling does not amount to a

final judgment, the order is nevertheless one which denies a claim of qualified immunity and is therefore immediately appealable. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985) (the district court's order denying a claim of qualified immunity is an appealable final decision within the meaning of 28 U.S.C. § 1291 even in the absence of a final judgment).

■ Although the defendant state officials noticed their appeal on the basis of *Mitchell v. Forsyth,* in their briefs they argue the merits of the underlying constitutional claims which were made by O'Bar and not disposed of by the district court. We must therefore resolve whether we have jurisdiction to reach these issues and, if so, whether it is prudent to do so.

■ Undoubtedly these broader issues that are briefed by both parties are relevant to a review of an order denying qualified immunity, because a core issue in resolving the immunity defense is whether the state officials violated clearly established legal norms. Unless O'Bar's complaint establishes a violation by the defendants of clearly established law of which reasonable persons would have known, the defendants are entitled to a dismissal of the federal claims even before the commencement of discovery. *See Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Thus, the availability of qualified immunity overlaps substantially the question on the merits of the constitutional claims. *See Mitchell v. Forsyth,* 472 U.S. at 545, 105 S.Ct. at 2825 (Brennan, J., dissenting) ("Although the qualified immunity question ... is not identical to the ultimate question on the merits, the two are quite closely related."). The same practical considerations for avoiding piecemeal appeals that underlie the final order doctrine instruct that when an appeal is otherwise warranted on a single issue, we may review all issues that the parties raise and which are reasonably related when that review will advance the litigation or avoid further appeals. Under the doctrine of pendent appellate jurisdiction, once we have taken jurisdiction over one issue, we may consider others that overlap. *See*

*San Filippo v. U.S. Trust Co. of New York, Inc.,* 737 F.2d 246, 255 (2d Cir.1984), *cert. denied,* 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985) (rejecting absolute immunity claim on interlocutory review under collateral order doctrine, but reversing denial of summary judgment under doctrine of "pendent appellate jurisdiction" on other grounds argued to trial court); *cf. Patterson v. Portch,* 853 F.2d 1399, 1403 (7th Cir.1988) ("We can review an unappealable order only if it is so entwined with an appealable one that separate consideration would involve sheer duplication of effort...."). *But see Rogue Rodriguez v. Lema Moya,* 926 F.2d 103, 105 (1st Cir. 1991) ("[I]nterlocutory review of a qualified immunity order does not in and of itself confer jurisdiction over other contested issues in the case."). The power, which flows from the plenary power of appellate review, appears to be recognized by the Supreme Court in *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 169–72, 94 S.Ct. 2140, 2148–50, 40 L.Ed.2d 732 (1974) (holding that the court of appeals, when reviewing a cost allocation order in a class action, had jurisdiction "to review fully" the district court's resolution of class action notice problems and to dismiss the class action on that ground). Even though the doctrine of pendent appellate jurisdiction empowers a decision on issues beyond that which originally justify the appeal, when a final judgment in the district court has not been entered, a self-imposed restraint must lead to a cautious exercise of that power, taking into consideration factors of judicial economy, injudicious intermeddling, and justice in the disposition. In this case we exercise the discretion to look at not only the immediate immunity issue, but beyond to the very related issues of whether the conduct of defendants denied O'Bar equal protection of the laws and liberty without due process, which all parties have briefed and argued and which may be finally disposed of here. At oral argument the parties confirmed that the Eighth Amendment claim, which the district court disposed of, is no longer an issue that is contested by the parties in this case.

## III

O'Bar contends that the actions to remove him from work release, transfer him, place him in administrative segregation, and change his custody grade were taken "solely because of community and political pressure generated by the victim's family." He argues that, when, as the defendants admit here, he committed no disciplinary infraction to prompt the actions taken against him and from November 1987 to June 1988 he was the only inmate as to whom action was taken on the initiative of a victim or private citizen (not affiliated with the Department of Correction), he was denied equal protection of the laws in violation of the Fourteenth Amendment. Stating his argument otherwise, he contends that the defendants "denied him equal protection of the laws because other inmates in the North Carolina Department of Corrections are judged by state law and departmental rules rather than the desires of private citizens, or the whims of departmental officials." He relies on *Durso v. Rowe*, 579 F.2d 1365, 1372 (7th Cir.1978), *cert. denied*, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979) (holding that prisoner stated equal protection claim where he alleged "that defendants purposefully denied him a hearing before terminating his work-release status even though hearings were customarily afforded to other inmates similarly situated"), and *Brennan v. Cunningham*, 813 F.2d 1, 11–12 (1st Cir.1987) ("Where an inmate is entitled to due process guarantees, as here, the influence of public pressure on the decision must be viewed as improper.").

The district court agreed with O'Bar, and granted his motion for summary judgment. The court stated:

> The defendant, Joseph Hamilton, violated the plaintiff's right to equal protection of the laws as provided in the Fourteenth Amendment to the United States Constitution by failing to apply fairly and equally to the plaintiff the same standards, practices and procedures established for all inmates in the North Carolina Department of Correction.
>
> . . . .

Contending that O'Bar has failed to establish a violation of the Equal Protection Clause, the defendants note that Hamilton, who made the decisions which are under attack, reached his decisions about O'Bar in the same manner as he had in the past and would in the future with respect to other inmates in similar circumstances. They argue that Hamilton did not act on whim, but in a reasoned response to relevant factors which are applicable to all inmates. O'Bar was placed on work release in the first instance on the basis of limited information, which did not include the central file in Raleigh, and his reclassification was consistent with the later available knowledge about O'Bar. The defendants observe that work release is a privilege based on numerous discretionary factors, one of which is the "goal of minimizing community and institutional risk." They argue that nothing in the law precludes the Department of Correction from "rectifying a situation" which violates existing policy. They contend that the conduct of the officials, which is factually undisputed, does not support a contention that O'Bar was denied equal protection of the laws. We agree.

When we conduct an equal protection review of the individualized decision of a state official made within his lawful authority, we apply the same analysis as is commonly used in the context of allegedly unlawful legislative decisions. The Fourteenth Amendment, in pertinent part, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The essence of the guarantee is that persons in the same circumstances will be treated similarly by the law, and a corollary follows that the Constitution does not require "things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940). The state may apply the law differently based on distinctive factual circumstances if the distinction is rationally related to a legitimate governmental purpose. When, however, the distinction (or other discrimination) is based on a "suspect classification" or effects the denial of a

fundamental right, the constitutional scrutiny sharpens its focus to determine whether the classification is narrowly tailored to serve a compelling governmental interest. *See Plyler v. Doe,* 457 U.S. 202, 216–17, 102 S.Ct. 2382, 2394–95, 72 L.Ed.2d 786 (1982). A class is suspect when it is defined from a deep-seated prejudice rather than the rational pursuit of some legislative objective, and a fundamental right is one that is otherwise guaranteed in the Constitution. *Plyler,* 457 U.S. at 216–17 nn. 14 & 15, 102 S.Ct. at 2394–95 nn. 14 & 15. In the end we must decide whether state action discriminated against the individual and if so whether it was otherwise legally justified.

O'Bar argues that since other prisoners have been removed from work release because of disciplinary infractions, removing him from work release because of public pressure denied him a liberty interest in a manner unlike the way it was denied other prisoners. Yet, even assuming, contrary to our own conclusion below, that work release in North Carolina is a constitutionally protected liberty interest, nothing has been brought to our attention to demonstrate that work release may be revoked only upon demonstrating a prisoner's disciplinary infraction. Under North Carolina law, work release is provided to the Department of Correction officials to be used as a privilege administered for multiple purposes that benefit the institution, the community and the inmate. Its administration must be consistent with due considerations for the safety of the inmate, the institution, and the public. *See Goble v. Bounds,* 188 S.E.2d 347, 349 (N.C.1972) (noting that Department of Correction and Board of Paroles are to consider the interests of the prisoner and the state in administering work release program). While it can hardly be disputed that O'Bar's change in status was prompted by the complaint of a member of the public, the record demonstrates clearly that the complaint, which was made from a relevant concern of safety, at most triggered an investigation. That investigation led to the permissible conclusions that O'Bar was placed on work release in the first instance on the basis of incomplete information, that his work re-

lease status was an error, and that he posed a threat to the community. Thus, in removing O'Bar from work release, Hamilton was acting not on whim, but on settled North Carolina law.

Furthermore, O'Bar has not identified any other inmate in his circumstances who was placed on work release or who did not also lose work release privileges when such circumstances were discovered. Indeed, no other inmate is identified as being in factual circumstances close to those of O'Bar. Thus the threshold showing that the decisions adversely discriminated against him has not been met.

■ Moreover, to the extent that it can be argued that he was treated differently from other inmates, the explanation is rational and based on circumstances reasonably related to North Carolina's proper interests in the work release program. In light of our decision in this case that O'Bar was not denied a fundamental liberty interest, a rational basis test must be applied to this equal protection claim. *See Plyler,* 457 U.S. at 216–17, 102 S.Ct. at 2394–95. While the public outcry initiated the decision to reclassify O'Bar, the complaint was based on a concern for the public safety. The decision to remove an inmate from work release based on the complaint of a member of the community in which the inmate was working, when coupled with a subsequent investigation which tended to confirm at least reasonable doubts concerning the public safety, hardly suggests an irrational and discriminatory decision that raises equal protection concerns. *Cf. Crowley v. Landon,* 780 F.2d 440, 443 (4th Cir.1985) (concluding that reincarceration of prisoners which was motivated by "the seriousness of the crimes involved and *the public outcry* against their release" did not deny them equal protection, because the motives were relevant considerations).

It remains undisputed that Pinion, who initially placed O'Bar on work release, knew only that O'Bar had no prior criminal record and that his sentence was relatively short. To fill a quota, he selected O'Bar for work release without consulting other available information. The information

available at that time in fact revealed numerous valid concerns raised by the victim, her family, and the district attorney. It is noteworthy that the district attorney, who prosecuted the case and was familiar with O'Bar, earmarked O'Bar for special treatment *at the outset* because of the risk he presented. Whether one agrees with the ultimate judgment of Hamilton to remove O'Bar from work release, the objective facts remain that O'Bar assaulted Julie Riggs twice with a knife, once actually stabbing her over 30 times; that on his arrest he sought to take his own life by cutting his wrist with a chain saw; that his mental condition was unstable; and that he expressed the intent to meet Julie Riggs in hell. To place this person on work release within four months of his initial incarceration or within six months of the incident raises a legitimate concern, to which Hamilton's decision was a rational response.

Accordingly, we reverse the order granting summary judgment in favor of O'Bar on his claim that he was denied equal protection of the laws.

## IV

 O'Bar contends that the various actions taken in reclassifying him, for no valid reason, also amounted to a denial of liberty without due process in violation of the Fourteenth Amendment. He contends that he was removed from work release and placed in administrative segregation without any process.

 The defendants argue that all actions taken with respect to O'Bar were discretionary actions given to the state to manage his confinement within the original sentence imposed. They contend that because no rights in work release, interprison transfers, administrative segregation or other reclassifications are given to O'Bar by North Carolina, he was denied no liberty to which he was entitled and his complaint therefore fails to state a claim upon which relief can be granted. The defendants argue alternatively that O'Bar in any event received the process that was due him. On April 13, 1988, two days after his removal from work release, O'Bar was informed by Pinion that he was being removed from work release on a temporary basis and being placed in administrative segregation for nonpunitive reasons based on information received from a member of the Charlotte community. Pursuant to O'Bar's inquiry as to whether the complaint came from the victim, Pinion agreed that that was possible. O'Bar was told that his classification status was under review and that he would meet a classification committee at which time a permanent assignment would be made. Three days later O'Bar submitted an inmate grievance alleging that his removal from work release was improper because he had committed no disciplinary infraction. His claim was denied on the basis that he was not being punished but rather reevaluated for proper classification. He appealed and was provided with more detailed information that his original assignment to work release was made without the benefit of pertinent information that was unavailable at the time. O'Bar took no further appeals, although they were available to him.

Prison officials are given broad administrative discretion in the management of the confinement of inmates, and no liberty interest is implicated so long as the "conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and does not otherwise violate the Constitution...." *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Changes in prisoners' location, variations of daily routine, changes in conditions of confinement (including administrative segregation), and the denial of privileges are matters contemplated within the scope of his original sentence to prison. *See Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir.1991). On the other hand, if a prisoner's term of imprisonment can be shortened or modified by rights conveyed to him under state law, those rights cannot be denied without due process. Thus a state-given *right* to mandatory parole or to good time credits creates a protected liberty interest. *See Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 12, 99

S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974). Moreover, punishment or confinement beyond that contemplated by the original sentence implicates infringements on liberty that are protected by due process. *See Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 1263–64, 63 L.Ed.2d 552 (1980) (involuntary transfer to a mental hospital).

When a state grants a right or entitlement to a condition of incarceration or a freedom, the inmate acquires a liberty interest by virtue of that right. On the other hand, a fear or hope about a future discretionary decision by prison administrators is too speculative to give an inmate a liberty interest. *Cf. Greenholtz,* 442 U.S. at 11, 99 S.Ct. at 2106. ("[T]hat the state holds out the *possibility* of parole provides no more than a mere hope that the benefit will be obtained."). "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Id.* at 7, 99 S.Ct. at 2104.

In *Gaston,* we held that under Virginia law, work release, furlough, and parole are all characteristically discretionary programs in which Gaston could acquire no entitlement and therefore no liberty interest. *Id.,* at 343–44. The work release statute under consideration there provided that if "the Director is satisfied [that an inmate] is trustworthy, [the inmate] *may* be approved for employment" or "educational and other related community activity programs...." Va.Code Ann. § 53.1–60(A) (1991) (emphasis added).

Similarly, North Carolina law establishes work release as a discretionary program. The statute provides that "[t]he Secretary of Correction is authorized and directed to establish a work-release plan under which an eligible prisoner *may be* released from actual custody during the time necessary to proceed to the place of his employment, perform his work, and return to quarters designated by the prison authorities." N.C.Gen.Stat. § 148–33.1(d) (1987) (emphasis added). To eliminate any doubt about whether the work release program in

North Carolina establishes rights, the statute provides expressly that "[n]either a recommendation for work release by the court or the decision of the Secretary of Correction to place a person on work release shall give rise to any vested statutory right to an individual to be placed on or continued on work release." N.C.Gen.Stat. § 148–33.1(i) (1987). Moreover, when interpreting the rights given by the state of North Carolina to prisoners under work release, the North Carolina state courts have concluded that grants of work release are "acts of grace or clemency" which are discretionary and confer upon the convicted person no rights to procedural due process. *See Goble v. Bounds,* 13 N.C.App. 579, 186 S.E.2d 638, 640, *aff'd,* 281 N.C. 307, 188 S.E.2d 347 (1972).

Transfers, administrative segregation and reclassification, such as were involved here, are also discretionary administrative acts in which an inmate obtains no liberty interest under North Carolina law. Transfers and reclassifications are inherent in the power given to the Secretary of Correction to commit prisoners to any prison within the state. *See* N.C.Gen.Stat. §§ 148–4, 148–36 (1987). The classification and transfer of inmates among authorized institutions is peculiarly an administrative function fully within the discretion given to prison officials. *See Gaston,* at 343.

■■■ While additional punishment by solitary confinement may implicate a liberty interest if it is found that the punishment exceeds that originally anticipated in the sentence, administrative segregation of nine days, imposed not as punishment but to facilitate processing of an inmate or for safety concerns or some other efficiency in the operation of the prison, falls within the scope of necessary prison management. *Compare Wolff,* 418 U.S. at 571–72 n. 19, 94 S.Ct. at 2982 n. 19 (solitary confinement may implicate liberty interest if beyond the scope of original sentence), *with Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983) (solitary confinement does not implicate liberty interest if "administrative segregation"). O'Bar was advised that he was not being pun-

ished, but rather was being segregated administratively to facilitate an orderly evaluation. The administrative right to segregate a prisoner for evaluation is given to North Carolina officials and is fully anticipated by the original sentence given to O'Bar. *See* N.C.Admin.Code, tit. 5, r. 2C.0301 (December 1984) (authorizing segregation for administrative purposes). Moreover, the applicable regulations permit administrative segregation in North Carolina for a period of 15 days without providing any reason to the inmate. N.C.Admin.Code, tit. 5, r. 2C.0302(c) (December 1984). Accordingly, we hold that the administrative segregation of O'Bar for nine days, imposed for administrative purposes and not punishment, does not implicate a liberty interest as guaranteed by the Fourteenth Amendment. We need not for purposes of this case reach the question of whether solitary confinement imposed as punishment for a prison regulation implicates a liberty interest.

## V

Having considered the federal constitutional claims on their merits, a consideration which is relevant to the question of whether the state officials violated clearly established law, we return to the defendants' claim of immunity. As we have held, the state officials who were sued in this case acted properly within the authority given to them under North Carolina law and the conduct violated no constitutionally secured right. If O'Bar was placed on work release in error, state officials were entitled to correct the mistake. If O'Bar's placement on work release was made without a full evaluation, they were entitled to conduct a full evaluation and reclassify him properly. He cannot claim that his status after losing work release privileges was inconsistent with his sentence. Because we have concluded that the decisions to remove O'Bar from work release to transfer him, to place him for nine days in administrative segregation, and to reclassify him did not violate the law, of necessity, the conduct of the state officials in taking these actions cannot be alleged to violate clearly established law, as is required under *Harlow.* Officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. If the plaintiff is unable to allege a violation of clearly established law, the defendants who claim qualified immunity are entitled to dismissal before commencement of discovery, because this immunity protects government officials not only from liability but also from trial. *See Turner v. Dammon,* 848 F.2d 440, 444 (4th Cir.1988). To give the public officials in this case the protection of their immunity, all federal claims must be dismissed without further proceedings.

## VI

We are left with O'Bar's state claim that, by removing him from work release, North Carolina denied him the fruits of his labor in violation of the North Carolina Constitution, art. I, § 1, which provides in relevant part, "We hold it to be self-evident that all persons ... are endowed by their Creator with certain inalienable rights; that among these are ... the enjoyment of fruits of their own labor...." This provision has been construed to grant a fundamental right to work and earn a livelihood. *See McCormick v. Proctor,* 217 N.C. 23, 6 S.E.2d 870, 876 (1940).

In the ordinary course, we would remand this claim to the state court for resolution. Where, as here, however, all federal claims are dismissed, leaving only a state claim that was briefed by both parties and is patently without merit, judicial efficiency is served without risk of injury to a proper notion of comity by our disposing of this claim.

The North Carolina Constitution protects a right to work and earn a livelihood but we find nothing that precludes North Carolina from confining a person to prison, in accordance with the due process of the law, and thereby denying him the right to work in society and enjoy the fruits of his labor. *See Treants Enterprises, Inc. v. Onslow*

*County,* 320 N.C. 776, 360 S.E.2d 783, 785 (1987) (explaining that "fruits of labor" clause allows state interference with an individual's ability to earn a living when "rationally related to a substantial government purpose"). When in prison, the terms of the work release program, in which we have already concluded O'Bar has no liberty (or property) right, provide that the fruits of a prisoner's labor are returned to the state and administered as provided by statute. *See* N.C.Gen.Stat. § 148–33.1(f) (1987). We reject any claim by O'Bar that he can have the full enjoyment of the fruits of his own labor when he is lawfully committed to prison.

Accordingly, the orders 1) denying the qualified immunity claim, 2) granting summary judgment in favor of O'Bar, and 3) denying the defendants' motion for summary judgment are reversed, and the case is remanded to the district court for entry of judgment dismissing all remaining claims against the defendants.

REVERSED AND REMANDED.