**SMITHFIELD FOODS, INC., Murphy Farms, LLC, and Prestage–Stoecker Farms, Inc., Farms, Inc., Plaintiffs,**

v.

**Thomas J. MILLER, Attorney General of the State of Iowa in his Official Capacity, Defendant.**

No. 4:02–CV–90324.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 22, 2003.

Richard K. Updegraff, Steven C. Schoenebaum, Harold N. Schneebeck, Jr., Brian P. Ricket, Brown Winick Graves Gross Baskerville & Schoenebaum PLC, Des Moines, IA, Warren E. Zirkle, McGuire Woods LLP, McLean, VA, E. Duncan Getchell, Jr., J. William Boland, Robert L. Hodges, William H. Baxter, II, McGuire-woods LLP, Richmond, VA, Robert P. Malloy, Malloy Law Firm, Goldfield, IA, for Plaintiffs.

Gordon E. Allen, Stephen H. Moline, Attorney General of Iowa, Des Moines, IA, Jon K. Lauck, Johnson Heidepriem Miner Marlow & Janklow LLP, Sioux Falls, SD, for Defendant.

Eldon L. McAfee, Beving Swanson & Forrest PC, Des Moines, IA, for Amicus.

E.C. Kellenberger, Algona, IA, Pro se.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

*When tillage begins, other arts follow. The farmers therefore are the founders of*

*human civilization.* Daniel Webster, *Remarks on Agriculture,* 457 (Jan. 13, 1840).

The question today is whether an Iowa statute that forbids pork processors from directly or indirectly owning, operating, or controlling pork production in the State unconstitutionally discriminates against interstate commerce. Plaintiffs Smithfield Foods, Inc. of Virginia (Smithfield or Smithfield Foods), Murphy Farms, LLC (Murphy Farms), and Prestage–Stoecker Farms, Inc., bring this suit against the Attorney General of the State of Iowa in his official capacity pursuant to 42 U.S.C. § 1983. Plaintiffs are asking the Court to declare the recently amended version of Iowa Code § 9H.2 an unconstitutional infringement on interstate commerce. Before the Court is Plaintiffs' motion for summary judgment on counts I and III of their complaint. The Court heard oral argument from both parties at a December 16, 2002 hearing. The matter is fully submitted. For the reasons set forth below, the Plaintiffs' motion is granted.

## I. BACKGROUND

### A. These Little Piggies Went to Market—The Parties

Iowa has a long and proud history as the largest hog producing state in America. This trend continues today. The U.S. Department of Agriculture (USDA) currently credits Iowa with twenty-six percent of the nation's total inventory of 58.9 million hogs. *NASS Quarterly Hogs and Pigs* 6, December 30, 2002. Hogs, in fact, outnumber people in ninety-one of Iowa's ninety-nine counties. As well, over thirteen percent of all American hog operations, and over twenty-five percent of hog

operations with over 2000 head are found in Iowa. *Id.* at 21–23. With a twenty-seven percent share of all hogs slaughtered in the U.S. last year, Iowa also dominates the nation in pork processing. *Id.* at 6. North Carolina, Iowa's closest competitor, trailed Iowa by more than ten percent in total hog inventory, nine percent in hog operations, seven percent in hog operations over 2000 head, and over ten percent in processed hogs.[1]

Not only does Iowa represent the acme of American pork production and processing, but the State also leads the nation in corn for grain production. Iowa's penchant for corn production both complements and contributes to the State's pork industry. Feed corn is cheaper in Iowa than in most other markets. Hog producers, therefore, often ship their livestock to Iowa for finishing. Plaintiffs assert that, in many instances, it is less expensive to ship a feeder pig to Iowa for finishing than it is to ship corn from Iowa to the hog. (Complaint ¶ 25). In 2001, approximately 12.9 million slaughter hogs, feeder pigs, and weaned pigs were shipped to Iowa for finishing and processing from elsewhere. This represented approximately forty-eight percent of all such shipments in the United States. *Id.* In 2000, the Iowa hog industry generated an estimated $2.24 billion in personal income, which contributed a total estimate of $3.37 billion to the gross state product and an estimated 77,000 jobs to the State. Of the roughly 14.25 million hogs slaughtered in Iowa pork processing plants last year, however, approximately ninety-six percent were consumed outside the State.

---

1. At the same time, North Carolina, home state of Defendant Murphy Farms, leads the nation in hog operations over 5000 head. *NASS Quarterly Hogs and Pigs* 23, December 30, 2002. Hog operations with over 5000

head account for a full 53 percent of the total U.S. hog inventory, and the 110 nationwide operations with over 50,000 head control an astonishing 49 percent of the country's swine inventory. *Id.* at 23, 25.

The first page of Plaintiff Smithfield Foods' 2002 Annual Report boasts that Smithfield is "the world's largest pork processor and hog producer." Inherent in this declaration is Smithfield's vertically integrated business model whereby Smithfield owns both hog production operations and pork processing facilities. In furtherance of its vertically integrated business model, Smithfield has made twenty-four business acquisitions since 1981, including meat processing facilities such as John Morrell & Co. and Gwaltney of Smithfield, Ltd., and pork producers like Brown's of Carolina, Circle Four LLC, Carroll's Foods, Inc., and Plaintiff Murphy Farms, LLC. Smithfield currently processes twenty million hogs annually, and is the largest pork processor in the United States with a twenty-one percent daily capacity share. As well, Smithfield raises an estimated twelve million hogs annually.

Plaintiff Murphy Farms, LLC is a Delaware corporation with its principle place of business in North Carolina. As will be explained more fully below, Murphy Farms, LLC was created in 2001 as the successor in interest to Murphy Farms, Inc. In its present form, Murphy Farms owns almost half of all of Smithfield's sows. Murphy Farms is wholly owned by Smithfield Foods.

Plaintiff Prestage–Stoecker Farms, Inc. (Prestage–Stoecker) is an Iowa corporation with its principle place of business in Ames, Iowa. Prestage–Stoecker currently owns the Iowa based assets of the former Murphy Farms, Inc. Prestage–Stoecker operates by contracting with Murphy Farms to purchase feeder pigs. The feeder pigs are imported to Iowa where Prestage–Stoecker contracts with 260 Iowa farms to finish the hogs on their farms using feed, medicines, and other supplies provided by Prestage–Stoecker. Prestage–Stoecker then sells the finished hogs to IBP, Inc., which ultimately processes the hogs.[2] Prestage–Stoecker operates by way of agreements with Murphy Farms whereby Murphy supplies feeder pigs, supplies, and all of Prestage–Stoecker's employees. As well, Smithfield currently finances Prestage–Stoecker's Iowa operations.

## B. These Little Piggies Stayed Home— Factual Background

### 1. These Little Piggies Had Roast Beef—Smithfield's acquisition of Murphy Farms and the Prestage–Stoecker Transactions

On September 2, 1999, Smithfield announced its intent to acquire all of the capital stock of Murphy Farms, Inc. (not itself a processor at the time). Among other things, the acquisition included an eighty million dollar premium for Smithfield to purchase Murphy Farms' Iowa based assets. On September 3, 1999, the Iowa Attorney General sent Smithfield a letter challenging the transaction as a violation of Iowa Code § 9H.2, which at the time prohibited a pork processor (Smithfield) from contracting for hog care and feeding (i.e. production) in Iowa if it ulti-

2. The short life of a Smithfield pig is actually quite hectic. The pigs are born after a 114 day gestation. The piglets then remain with the sow for 17 days at which time their shared immunity wanes, and the pigs are removed to a nursery to discourage illness. After seven weeks and four different diets, the burgeoning 40–50 pound piglets clamber onto trucks for the long road trip from North Carolina to Iowa. Upon reaching their destination at the feeder farm of their choosing, the pigs are again fed four different diets for around 140 days. The pigs, now weighing between 245–260 pounds, are then sent to the slaughterhouse for processing. The cycle is less than a year from conception to consumption.

mately slaughtered those hogs.[3] Smithfield maintained that since it did not ultimately slaughter the hogs, which were processed by IBP, Inc., the acquisition would not violate the statute. In response to continued opposition from the Attorney General's office, Smithfield modified the transaction. The Iowa Attorney General, however, filed a lawsuit against Smithfield in Iowa District Court in and for Humboldt County for a violation of Iowa Code § 9H.2, because he believed the transaction would give Smithfield, a processor, control over the Murphy Farms hog producing operations located in Iowa. *State of Iowa ex rel. Miller v. Smithfield,* Equity No. EQCV 016629.

On January 20, 2000, Stoecker Farms, Inc. was formed under Iowa law as a family farm corporation. On the same day, Randall Stoecker resigned his position as head of the Midwest division of Murphy Farms, Inc, and was issued 100 shares of common stock for an initial investment of $10,000. Smithfield loaned the remainder of the initial investment. Less than a month later, Murphy Farms, Inc. rehired Stoecker to manage its non-Iowa based Midwest operations. Murphy Farms, Inc., sold its Iowa-based assets to Stoecker and assigned its contract with IBP to Stoecker as well. Smithfield then bought the non-Iowa assets of Murphy Farms, Inc. As noted above, Murphy Farms then provided out-of-state feeder pigs to Stoecker, which contracted with Iowa farms for finishing and sold the hogs to IBP for processing. Because of Smithfield's ownership position in Murphy Farms, the Attorney General

amended its state court petition to challenge the formation of Stoecker and the transactions as a "sham".

In May 2001, William Prestage, a former member of Smithfield's board of directors purchased a fifty-one percent interest in Stoecker, which was then renamed to Prestage–Stoecker Farms, Inc. This purchase was also challenged by the Attorney General in its state action as an attempt to get around the limits of § 9H.2. In February 2002, the Iowa District Court held that Stoecker's formation was not a sham and that neither Smithfield nor Prestage–Stoecker was in violation of § 9H.2.

### 2. These Little Piggies had None— Amendments to Iowa Code § 9H.2

During the 2000 legislative session, and while the court challenge continued, the Iowa General Assembly amended Iowa Code § 9H, effective July 1, 2004. Senate File 2349 "An Act Prohibiting a Processor from Contracting for the Care and Feeding of Swine in this State, Making Penalties Applicable, and Providing an Effective Date." In its first amended form, § 9H.2 prohibited any processor from "directly or indirectly contracting for the care and feeding of swine in this state." The amendment specifically defined "contract for the care and feeding of swine" to mean "an oral or written agreement between a person and the owner of swine, under which a person agrees to care for and feed the·owner's swine on the person's premises." Iowa Code § 9H.1 (6A). The amendment also expanded an exemption for Iowa cooperative associations to include cooper-

---

**3.** At the time, Iowa Code § 9H.2 read in pertinent part:

In order to preserve free and private enterprise, prevent monopoly, and protect consumers, it is unlawful for any processor of beef or pork or limited partnership in which a processor holds partnership shares as a general partner or partnership shares

as a limited partner, or limited liability company in which a processor is a member, to own, control or operate a feedlot in Iowa in which hogs or cattle are fed for slaughter. In addition, a processor shall not directly or indirectly contract for the care and feeding of swine in this state.

ative corporations organized under Iowa Code Ch. 501.

In April 2002, the Iowa General Assembly passed further amendments to § 9H, also effective July 1, 2004. Senate File 2309. This amendment, unlike the previous amendments, expands the prohibition on activities by processors in Iowa to ban financing of anyone who "directly or indirectly" contracts for swine care and feedings in Iowa. Iowa Code § 9H.2(b)(1)(b). The amendment also bans processors from directly or indirectly receiving the net revenue derived from Iowa-based swine operations or activities by those who contract for swine care and feeding in the state. § 9H.2 (b)(1)(d). As well, the amendment expands the definition of processor to include an individual who holds, or, within the past two years, held, an executive position in a processor entity that has direct or indirect control of processing operations valued at over $260 million, § 9H.1 (19)(b). Among other things, the executive position provision of the processor definition includes a person who, within the past two years, held a position on a processor corporation's board of directors. *Id.* Finally, the amendment raised the penalty for violation from a total fine of $25,000 to a possible fine of $25,000 per day. § 9H.3 (2)(a).

### 3. And These Little Piggies Cried Wee Wee Wee All the Way to Federal Court

The Iowa Attorney General has advised Plaintiffs that they will be subject to suit and to penalties, including fines up to $25,000 per day, if they continue their operations after July 1, 2004, when they will clearly be in violation of the amended statute. In particular, Smithfield and Murphy Farms will no longer be able to contract with Prestage–Stoecker or to finance any of its operations. Prestage–

Stoecker will no longer be permitted to contract with Iowa farms if it receives financing from Smithfield. Smithfield filed the present action to challenge the constitutionality of Iowa Code § 9H.2 in its amended form.

## II. SUMMARY JUDGMENT STANDARD

Rule 1 of the Federal Rules of Civil Procedure mandates that all Rules, including Rule 56, "be construed and administered to secure the just, speedy, and inexpensive determination of every action." Accordingly, summary judgment is not a paper trial. "The district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is any material dispute of fact that requires a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); 10 *Charles A. Wright, Arthur R. Miller & Mary Kay Kane* § 2712, at 574–78. The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge,* 24 F.3d at 921.

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Walsh v. United States,* 31 F.3d 696, 698 (8th Cir.1994); *United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990); *Woodsmith Publ'g v. Meredith Corp.,* 904 F.2d 1244,

1247 (8th Cir.1990). The moving party must establish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is genuine issue for trial. *See* Fed.R.Civ.P. 56(c),(e); *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of some alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material....Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## III. DISCUSSION

### A. Dormant Commerce Clause Jurisprudence

■ The Commerce Clause of the United States Constitution provides that "Congress shall have the power ... to regulate Commerce ... among the several States."

U.S. Const. art. I, § 8. The United States Supreme Court has long since recognized that "the Commerce Clause not only grants Congress the authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce." *New Energy Co. v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) (citing *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534–535, 69 S.Ct. 657, 93 L.Ed. 865 (1949); *Welton v. Missouri*, 91 U.S. 275, 23 L.Ed. 347 (1875). Often described as the dormant commerce clause, this "negative" reciprocal of the Commerce Clause proscribes an individual state from engaging in economic protectionism through regulatory schemes crafted "to benefit in-state economic interests by burdening out-of-state competitors." *Limbach*, 486 U.S. at 273–274, 108 S.Ct. 1803 (citations omitted).

■ When a State's regulatory measures are challenged under the dormant commerce clause, the Court's analysis follows a two-tiered approach. *SDDS, Inc. v. State*, 47 F.3d 263, 267 (8th Cir.1995). First, the Court must determine whether the challenged statute discriminates against out-of-state interests. *Id.* "When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out of state interests, [the Supreme Court has] generally struck down the statute without further inquiry." *Brown–Forman Distiller's Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) (citations omitted). Discrimination may occur in one of three possible forms. *Id.* The text of the statute may exhibit facial discrimination against foreign interests. *Id.* (citing *Philadelphia v. New Jersey*, 437

U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)). A statute might be facially neutral, but will still be struck down if the regulation has a discriminatory purpose. *SDDS*, 47 F.3d at 267 (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 352–53, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)). Lastly, a discriminatory effect is equally fatal to a facially neutral statute. *Id.* (citing *Maine v. Taylor*, 477 U.S. 131, 148 n. 19, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986)). If the state statute is found to be discriminatory, it is subjected to a strict scrutiny analysis whereby the act is all but doomed lest the state can prove that the regulatory scheme was enacted in pursuit of an important state interest, and that the state had no other, non-discriminatory, means to address the issue. *Oregon Waste Sys., Inc. v. Department of Envtl. Quality of the State of Oregon*, 511 U.S. 93, 114 S.Ct. 1345, 1351, 128 L.Ed.2d 13 (1994); *Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 818 (8th Cir.2001). "State statutes that clearly discriminate against interstate commerce are routinely struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Limbach*, 486 U.S. at 274, 108 S.Ct. 1803 (citations omitted).

█ If the Court finds that the challenged statute is not discriminatory, or if the state successfully advances justification for the discrimination, the analysis moves to the second phase. Here, the Court must weigh the state's interest against the burden the statute places on interstate commerce. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). The Supreme Court has noted that "there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Brown–Forman*, 476 U.S. at 579, 106 S.Ct. 2080 (citing *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 440–441, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978)).

## B. Iowa Code § 9H.2

In its present and pertinent form, Iowa Code § 9H.2 reads:

**9H.2. Prohibited operations and activities-exceptions**

The purpose of this section is to preserve free and private enterprise, prevent monopoly, and also to protect consumers.

1. Except as provided in subsections 2 through 4, and section 9H.2A, all of the following apply:

b. For swine, a processor shall not do any of the following:

(1)(a) Directly or indirectly own, control, or operate a swine operation in this state.

(b) Finance a swine operation in this state or finance a person who directly or indirectly contracts for the care and feeding of swine in this state.

For purposes of subparagraph subdivision (a) and this subparagraph subdivision, all of the following apply:

(I) "Finance" means an action by a processor to directly or indirectly

loan money or to guarantee or otherwise act as a surety.

(ii) "Finance" or "control" does not include executing a contract for the purchase of swine by a processor, including but not limited to a contract that contains an unsecured ledger balance or other price risk sharing arrangement. "Finance" also does not include providing an unsecured open account or an unsecured loan, if the unsecured open account or unsecured loan is used for the purchase of feed for the swine and the outstanding amount due by the debtor does not exceed five hundred thousand dollars. However, the outstanding amount due to support a single swine operation shall not exceed two hundred fifty thousand dollars.

(c) Obtain a benefit of production associated with feeding or otherwise maintaining swine, by directly or indirectly assuming a morbidity or mortality production risk, if the swine are fed or otherwise maintained as part of a swine operation in this state or by a person who contracts for the care and feeding of swine in this state.

(d) Directly or indirectly receive the net revenue derived from a swine operation in this state or from a person who contracts for the care and feeding of swine in this state.

(2) Directly or indirectly contract for the care and feeding of swine in this state. However, this subparagraph does not apply to a cooperative association organized under chapter 497, 498, 499, or 501, if the cooperative association contracts for the care and feeding of swine with a member of the cooperative association who is actively engaged in farming. This subparagraph does not apply to an association organized as a cooperative in which another cooperative association organized under chapter 497, 498, 499, or 501 is a member, if the association contracts with a member which is a cooperative association organized under chapter 497, 498, 499, or 501, which contracts for the care and feeding of swine with a member of the cooperative who is actively engaged in farming.

## C. Smithfield's Challenges to Iowa Code § 9H.2

Although Plaintiffs' complaint lists five challenges to Iowa Code § 9H.2, their motion for summary judgment asks the Court to consider only counts I and III. Both charges attack the statute under the first tier of the analysis. Plaintiffs' first count alleges that Iowa Code § 9H.2 discriminates against out-of-state interests to the benefit of Iowa interests both by its terms and in its intended effect. Accordingly, Plaintiffs argue that § 9H.2 amounts to nothing more than economic protectionism, and that the statute it, therefore, a per se violation of the dormant commerce clause of the United States Constitution.

### 1. Discrimination

### a. Plaintiffs' Claim

In support of their claim that § 9H.2 facially discriminates against interstate commerce, Plaintiffs point to the exemption for Iowa cooperatives, or foreign cooperatives that contract with Iowa cooperatives or that have an Iowa cooperative in their membership. *See* § 9H.2 (1)(b)(2). Plaintiffs argue that it is "beyond cavil that far from making vertical integration illegal throughout the state, Iowa Code § 9H.2 allows entities organized under Iowa law or that contain an Iowa compo-

nent to their membership to vertically integrate their pork operations without any statutory constraint or penalty." (Pl. Brief at 8–9). Under the exemption, Iowa cooperatives are free to conduct business in a manner that will subject Plaintiffs to fines of up to $25,000 per day. The statute's discriminatory treatment of out-of-state interests versus in-state cooperative interests, Plaintiffs argue, necessitates the Court's application of the strictest level of scrutiny. Furthermore, because the State can offer no legitimate explanation other than economic protectionism, Plaintiffs ask the Court to strike down the statute as unconstitutional.

Plaintiffs also present evidence that they argue evinces a discriminatory intent, purpose, and effect in Iowa's enactment of the amended § 9H.2. Most conspicuous, argue Plaintiffs, are comments made by Iowa Senate Majority Leader Stewart Iverson, Jr., in a newsletter that was published and distributed on the same day Senator Iverson introduced the most recent version of § 9H.2 in the General Assembly. In the newsletter, Iverson explains that "[i]n response to a recent Iowa court decision that let's [sic] Smithfield Foods finance an Iowa-based hog producer, the Iowa Senate will consider legislation this week to protect farmers from large meatpacking firms." (Complaint ¶ 95) (reprinting Stewart Iverson, Jr., *Iverson's Insights: Protecting Iowa Farmers from Meat Processors*, (Mar. 4, 2002)). Plaintiffs argue that Senator Iverson's declaration clearly demonstrates that Iowa amended § 9H.2 with an intent and purpose to effectively exclude Smithfield and other out-of-state interests from the Iowa pork industry.

Plaintiffs also point to an advertising supplement for *Iowa 2010: A Strategic Planning Initiative,* a comprehensive plan for the State's future that was complied through the initiative of Iowa Governor Thomas Vilsack. The supplement, which was paid for by the Governor's Strategic Planning Council, states that:

[a]griculture is the soul of Iowa, but its long-term growth rate is less than half the rate of other industries. The reliance on traditional agricultural commodities and markets will shrink as the forces of an integrated world economy continue a 30–year downward spiral of raw commodity prices. Research suggests this will be especially true for food prices as production rates increase in emerging market countries. Open markets for commodity crops will diminish in favor of highly integrated systems driven by consumer demand. While dramatically altering the face of traditional farming practices, these changes provide a unique opportunity for Iowa to reinvent agriculture and its role in feeding the world.

*Iowa 2010—The New Face of Iowa: Embracing Iowa's Values—Shaping Iowa's Future,* 4 (2000 advertising supplement).

Additionally, Plaintiffs note that *Iowa 2010* has as one of its stated goals that Iowa will be "known as the consumer-driven life science capital of the world, aligning producers with consumers, diversifying the agricultural economy and increasing farm income." Plaintiffs argue that *Iowa 2010* provides ample evidence of the fact that Iowa realizes the economical benefits of a vertically integrated pork industry, and that by amending § 9H.2, Iowa sought to preserve these benefits for Iowans alone.

Moreover, Plaintiffs argue that the Iowa Code actually codifies a public policy directive advocating discriminatory and protectionist regulatory schemes such as Iowa Code § 9H.2. In passing the Iowa Agricultural Industry Finance Act, the General Assembly found "that this state is in a period when the economic structure of

agriculture and the production, processing, and marketing of agricultural products is undergoing a period of rapid transformation." Iowa Code § 15E.203(1) (1998). Following the legislature's findings, the Act states in pertinent part:

> It is the intent of the general assembly and purpose of this division that *this state* capture the greatest benefit from opportunities created during this period, by encouraging *local* agricultural producer-led ventures to expand production and processing of high value agricultural products, including agricultural processed products, to organize new business structures within the state to carry out these ventures, and to market and deliver increasingly high value agricultural products to consumers around the world. In carrying out this purpose, *state resources ... shall be used* to assure all of the following:
> a. *That the majority of the wealth created by Iowa agricultural productivity is retained in this state.*
> c. That agricultural *producers in this state are provided with an opportunity to acquire a majority ownership interest in Iowa agricultural industry ventures* promoted under this division.
> d. *That this state becomes a world model for agricultural producer-based vertical cooperation* which depends upon broadly shared access to information, capital, and cooperative action.

Iowa Code § 15E.203 (2) (emphasis added).

Plaintiffs contend that § 9H.2 unconstitutionally furthers an official and discriminatory state policy to ensure "that the majority of the wealth created by Iowa agricultural productivity is retained in this state." Iowa Code § 15E.203(2)(a). The intent and effect of § 9H.2, argue Plaintiffs, "is to eliminate Smithfield from doing business in Iowa and allow only Iowa cooperative associations or regional cooperatives with at least one such Iowa entity as an owner contracting with Iowa residents to benefit from the vertical integration business model." (Complaint ¶ 132). Plaintiffs argue that Iowa, through § 9H.2, seeks to ensure that only Iowans can practice Smithfield's vertically integrated business model in Iowa. Thus, because the Act facially, in effect, and in purpose discriminates against out-of-state entities with no justification other than economic protectionism, Plaintiffs ask the Court to strike down § 9H.2 as a per se violation of the dormant commerce clause.

**b. In Defense of § 9H.2**

The State offers several arguments to refute Plaintiffs contention that § 9H.2 facially discriminates against extra-state entities. First, Iowa argues that § 9H.2 does not facially discriminate because the law makes no distinction between in-state and out-of-state swine processors, but that the law applies universally to all processors. Defendant also defends the Act's cooperative exemption as legally sound, because "if a cooperative does not have an affiliate organized under Iowa law, then the cooperative does not conduct business in the state of Iowa and therefore would not be affected by the statute. Since Iowa law contains no requirement that a non-Iowa cooperative be physically present in Iowa in order to be organized under Iowa law, § 9H.2 does not discriminate between Iowa and non-Iowa cooperatives." (Defendant's Brief at 4). Next, Iowa argues that "the unique treatment of cooperatives is widely recognized." *Id.* In support of its claim, the State points to federal laws exempting agricultural cooperatives from federal antitrust, tax, and securities laws. *Id.* at 6 (citing the Clayton Act, 15 U.S.C. § 17 (antitrust)); the Capper–Volstead Act, 7 U.S.C. § 291–92 (antitrust); I.R.C.

§ 521(b)(tax); and 15 U.S.C. § 78*l* (g)(2)(E)-(F) (security registration).

Iowa also contends that the legislature's purpose in passing § 9H.2, and the act's intended effect, was legitimate and not discriminatory. The stated purpose of § 9H.2 is "to preserve free and private enterprise, prevent monopoly, and also to protect consumers." The State argues that Smithfield has failed to prove that the legislature had any purpose other than that which it put into the text of the Act. In so doing, the State contends that the Court must adhere to Iowa's established standards of statutory construction; unless the terms of the statute are ambiguous, Iowa law requires that the Court give the language of the statute its plain and rational meaning. *Le Mars Mut. Ins. Co. of Iowa v. Bonnecroy*, 304 N.W.2d 422, 424 (Iowa 1981). Iowa argues that the express statement of purpose in § 9H.2 is unambiguous, and, therefore, that the Court's inquiry into the legislature's purpose and intent in enacting the statute may extend no further than the text of the statute. In light of an express and unambiguous statement of purpose, the State contends that any evidence of discriminatory legislative intent imbued in *Iowa 2010*, or Iowa Code § 15E.203 is irrelevant and inadmissible in the Court's determination. Accordingly, if the Court restricts its inquiry to the unambiguous terms of § 9H.2, the State argues that there exists no evidence of a discriminatory legislative intent, purpose, or effect. Although Iowa's defense of its regulatory scheme is noble, the Court cannot agree with any of the State's proffered defenses.

**c. Analysis**

 After careful consideration, the Court is left with but one conclusion, Iowa Code § 9H.2, on its face, in its purpose, and in its effect unconstitutionally discriminates against out-of-state interests in fa-

vor of local ones. Although Iowa argues that the statute is facially neutral, this is not the case. "Discrimination," as the term is used in commerce clause considerations, means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Hampton Feedlot*, 249 F.3d at 818 (quoting *Oregon Waste Sys., Inc. v. Dep't of Evntl. Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). Here, § 9H.2 narrowly tailors its prohibitions to cast a wide net around Plaintiffs' economic activities, all the while reserving the same economic activities for Iowa cooperatives or cooperatives with an Iowa component.

 Iowa argues that § 9H.2 is facially neutral because Iowa law does not require that a business need not actually be present in Iowa to organize itself as a cooperative, and because the act applies evenhandedly to all entities, other than cooperatives, because it prohibits all processors from owning livestock. The Court finds neither argument compelling. A cooperative organized under Iowa law is an Iowa entity regardless of where the entity is physically located. *Cf. Kolls v. Aetna Cas. and Surety Co.*, 378 F.Supp. 392, 393 (S.D.Iowa 1974) (deeming an Iowa corporation to be a citizen of Iowa), *aff'd*, 503 F.2d 569 (8th Cir.1974). The fact that the exemption applies only to cooperatives, and that § 9H.2, therefore, evenhandedly applies to all other Iowa and out-of-state interests, cannot be the Act's saving grace. An "ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition." *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 391, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). Thus, a showing that the State favors only in-state cooperatives over all other business entities does nothing to obviate the fact that the statute blatantly protects the rights of Iowans to engage in

conduct forbidden to out-of-state entities such as Plaintiffs. When, as here, a statute clearly prohibits out-of-state entities from conducting business in a certain way, and then expressly exempts in-state entities from the very same prohibitions, there can be no mistake that such a regulatory scheme treats in-state and out-of-state interests differently.

Iowa's argument that agricultural cooperatives often enjoy differential treatment under federal law than do other business entities is also of no avail. Iowa overlooks one important consideration; Congress has the power to regulate interstate commerce, and, in so doing, to discriminate among different entities in matters of interstate commerce. The dormant commerce clause precludes the state of Iowa from exercising the same power. Thus, the fact that federal antitrust, tax, and securities laws provide a different standard for cooperatives is irrelevant to a dormant commerce challenge to a State law. Iowa, however, also cites the Court to the Supreme Court's opinion in *Tigner v. Texas*, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124 (1940), to validate the cooperative exemption. In *Tigner*, the Court rejected a habeas corpus appeal challenging a Texas antitrust criminal law that exempted farmers, stockmen, and farmer cooperatives. *Id.* at 143–49, 60 S.Ct. 879. In *Tigner*, however, the Court upheld the challenged statute under equal protection grounds. The Court never mentioned the dormant commerce clause. And while an economic regulation elicits the lowest level of scrutiny -mere rationality when reviewed under an equal protection framework, the same law, if found to be discriminatory, will be subjected to a strict scrutiny analysis when challenged under the dormant commerce clause. Thus, *Tigner* is not instructive in the present case. As the Court finds that § 9H.2 facially discriminates against out-of-state interests in favor of local ones, the Court must, therefore, review the law using a strict scrutiny analysis.

■■■■ Finally, the State argues that although the Court has found the cooperative exemption discriminatory, the Court may still sever the offending provision and leave the remainder of the Act in full force and effect. As Defendant notes, Iowa Code chapter 9H contains a severability clause that expresses the legislature's intent that if any portion of the Act is found invalid, the invalidity should not affect the law's other provisions. As severability is unquestionably a matter of state law, *see Jones v. Vilsack*, 272 F.3d 1030, 1038 (8th Cir.2001) (quoting *Leavitt v. Jane L.*, 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996)), Defendant reminds the Court that Iowa law favors severance of invalid statutory provisions. *Id.* In Iowa, "there is no presumption that the legislature intends its statutes to be treated as an entirety." *Clark v. Miller*, 503 N.W.2d 422, 425 (Iowa 1993). "Severance is appropriate if it does not substantially impair the legislative purpose, if the enactment remains capable of fulfilling the apparent legislative intent, and if the remaining portion of the enactment can be given effect without the invalid provision." *Am. Dog Owners Ass'n, Inc. v. City of Des Moines*, 469 N.W.2d 416, 418 (Iowa 1991) (per curiam). In the present case, however, simply severing the cooperative exemption from § 9H.2 does not remedy the statute's defects. As discussed below, the Act was passed with a discriminatory purpose to effect a discriminatory result. Accordingly, while severing the cooperative exemption might cure some of the facial defects, the Act's discriminatory purpose and effect persist. Severability is, therefore, not an option.

■ The Court finds that § 9H.2 is not only facially discriminatory, but that, as a matter of law, the Iowa General Assembly enacted § 9H.2 with a discriminatory intent and purpose. As Defendant notes, the stated purpose of § 9H.2 is to "preserve free and private enterprise, prevent monopoly, and also to protect consumers." Iowa Code § 9H.2. As noted above, the State contends that this clear and unambiguous statement of legislative purpose precludes any further inquiry into legislative intent. This is erroneous. "When considering the purpose of a challenged statute, [the] Court is not bound by '[t]he name, description or characterization given it by the legislature or the courts of the State, but will determine for itself the practical impact of the law.'" *Waste Systems Corp., v. Minnesota*, 985 F.2d 1381, 1387 (8th Cir.1993) (quoting *Hughes v. Oklahoma*, 441 U.S. at 336, 99 S.Ct. 1727 (quoting *Lacoste v. Louisiana Dep't of Conservation*, 263 U.S. 545, 550, 44 S.Ct. 186, 68 L.Ed. 437 (1924))). The Court, therefore, must consider all relevant evidence in determining whether § 9H.2 was enacted for a discriminatory purpose or with a discriminatory effect.

Evidence that the Iowa legislature amended § 9H.2 to specifically discriminate against Smithfield as an out-of-state processor can be no more direct than Senator Iverson's comment that "[i]n response to a recent Iowa court decision that let's [sic] Smithfield Foods finance an Iowa-based hog producer, the Iowa Senate will consider legislation this week to protect farmers from large meatpacking firms." Moreover, Iowa certainly understands the economic opportunities available in a vertically integrated pork market. The advertising supplement for Iowa's long term plan, *Iowa 2010*, illustrates both the State's recognition of the trend towards a vertically integrated agriculture industry, and its desire to reap the benefits of this evolution for Iowa farmers. Iowa law reiterates that Iowa public policy seeks to ensure "[t]hat the majority of the wealth created by Iowa agricultural productivity is retained in this state." Iowa Code § 15E.203 (2). Viewed individually, none of these facts conclusively demonstrate that the Iowa legislature had a discriminatory purpose in enacting the amended § 9H.2. When considered collectively, however, and in conjunction with the terms of Chapter 9H, the undeniable conclusion is that the State amended the Act with a discriminatory purpose to achieve a discriminatory effect. The Constitution tolerates neither.

As amended, Iowa Code Chapter 9H imposes a death sentence on Smithfield's Iowa business like a modern day bill of attainder. That the law specifically targets Plaintiffs is incontestable. For example, in amending the definition of processor to include a person who has held an executive position in a processor company with an annual wholesale value of 260 million dollars or more, the State might as well have named Randall Stoecker and William Prestage. *See* Iowa Code § 9H.1 (19)(b). In fact, Plaintiffs' allege that this provision was widely and jocularly referred to by some legislators as the "Stoecker Amendment." (Complaint ¶ 103). The intended effect is clear; Iowa has sought to ensure that Plaintiffs are unable to conduct their business in the state of Iowa. Accordingly, the Court finds that the purpose and intended effect of § 9H discriminates against interstate commerce.

■ Having concluded that Iowa Code § 9H.2 discriminates against interstate commerce on its face, in purpose, and in effect, the Court now reviews the statute under the strict scrutiny framework. "Under strict scrutiny, a state statute vio-

lates the Commerce Clause unless the state can show that the statute serves a legitimate local purpose unrelated to economic protectionism and that the purpose could not be served as well by nondiscriminatory means." *Cotto Waxo Co. v. Williams,* 46 F.3d 790, 794 (8th Cir.1995) (citing *Hughes,* 441 U.S. at 336, 99 S.Ct. 1727). Iowa maintains that the stated purpose of § 9H.2, "to preserve free and private enterprise, prevent monopoly, and also to protect consumers," is a legitimate local purpose, and not economic protectionism. The Court deeply sympathizes with Iowa's attempt to protect its family farmers, and certainly agrees that these are noble purposes. The Court, however, has already concluded that this stated purpose is disingenuous. Rather, the evidence makes clear that the State enacted § 9H.2 with an eye towards nothing more than protecting local economic interests from out-of-state behemoth Smithfield Foods. Moreover, the proffered statement of purpose does nothing to preserve the Act from a Commerce Clause challenge. As Justice Jackson wrote:

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders; such has been the doctrine of this Court which has given it reality.

*H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 539, 69 S.Ct. 657, 93 L.Ed. 865 (1949).

Thus, by claiming to "preserve free and private enterprise, prevent monopoly, and also to protect consumers," the State of Iowa purports to effectuate precisely the sort of discriminatory scheme against which the Commerce Clause was conceived to protect all citizens of this country. As Iowa can offer no justifiable explanation for its patently discriminatory regulation, the State cannot overcome its burden under the strict scrutiny analysis. The Court, therefore, holds that because Iowa Code § 9H.2 discriminates against interstate commerce on its face, in its effect, and in its purpose for no reason other than economic protectionism, the Act violates the Commerce Clause of the United States Constitution.

### D. Extraterritorial Effect

Plaintiffs' third count challenges § 9H.2 as an extraterritorial regulation of interstate commerce. Anytime a State enacts regulatory measures that have the effect of regulating commerce beyond the borders of the state, the statute must be stricken as an unconstitutional usurpation of one of Congress' plenary authorities. Thus, Smithfield again argues that § 9H.2 is a per se violation of the dormant commerce clause. Because the Court has already determined that § 9H.2 unconstitutionally discriminates against interstate commerce, the Court sees no need to address Plaintiffs' extraterritorial effect challenge.

### IV. ORDER

The Court is keenly aware that this order and opinion substantially resolves Plaintiffs' prayer for relief, and that there is presently no need to continue this litigation to address Plaintiffs' other claims. Thus, pursuant to 28 U.S.C. § 1292(b), the Court is of the opinion that the foregoing order involves a controlling question of law

as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. Accordingly, the United States Court of Appeals for the Eighth Circuit may, within its discretion, permit an appeal to be taken from this order if application is made to it within ten days after entry of the order.

Plaintiffs' motion for summary judgment is granted on Count I. Plaintiffs' motion on Count III is moot. The Court holds that Iowa Code § 9H.2 is unconstitutional on its face, in its intended purpose, and as applied to Plaintiffs under Art. I § 8 of the United States Constitution. The Court hereby declares Iowa Code § 9H.2 null and void, and orders the Defendant and the State of Iowa to strike the law from its books. Defendant and the State of Iowa are permanently enjoined from enforcing any provision of the law.

IT IS SO ORDERED.